**In re J. L. THOMSON RIVET
CORPORATION, Debtor.**

**Bankruptcy No. 78–381–L.**

United States Bankruptcy Court,
D. Massachusetts.

April 12, 1982.

Henry Rose, Gen. Counsel, James N. Dulcan, Asst. Gen. Counsel, William G. Beyer, Trial Atty., Neal Schelberg, Washington, D. C., for Pension Benefit Guaranty Corp.

Stephen M. Richmond, Kaye, Fialkow, Franklin, Richmond & Rothstein, Boston,

Mass., for The Official Creditors Committee of J. L. Thomson Rivet Corp.

Richard L. Morningstar, Marc S. Plonskier, Peabody, Brown, Rowley & Storey, Boston, Mass., for International Basic Economy Corp.

## ORDER RE PROOF OF CLAIM

THOMAS W. LAWLESS, Chief Judge.

This matter is before the Court on an objection by Creditors Committee and the International Basic Economy Corporation ("IBEC") (collectively the "Objectors") to a proof of claim filed by the Pension Benefit Guaranty Corporation (the "PBGC") for pension contributions owed by the debtor, J. L. Thomson Rivet Corporation ("JLT"), to its pension plan. The objectors contend that PBGC is precluded from asserting this claim by its enabling legislation, Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301 et seq. The relevant facts are not in dispute.

JLT, the debtor in these proceedings, entered into a pension agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local 946 (the "UAW") effective as of January 1, 1955. The pension agreement was most recently amended and restated in a Pension Agreement dated August 3, 1972 (the "Plan"). The Plan was adopted pursuant to a collective bargaining agreement between the employer JLT and the UAW effective April 12, 1972 and a renegotiated collective bargaining agreement effective April 12, 1975.

Pursuant to the terms of the Plan, JLT entered into a trust agreement providing for the management, investment and distribution of Plan assets with the First National Bank (the "Bank") as trustee.

Under the Plan, JLT was required to make contributions "in amounts sufficient to insure the successful operation of the Plan on a sound actuarial basis, based on periodic actuarial computations." Plan Article I, Section XIII(1).

The Plan was properly funded in accordance with the language of the pension agreement for several years. However, JLT failed to make the required contributions to the trustee Bank for the Plan years of 1973, 1974, 1975, and 1976. On March 24, 1976, the UAW and Local 946 joined the trustee Bank as an involuntary plaintiff and filed an action in the United States District Court for the District of Massachusetts seeking the contributions due and owing to the Plan for those Plan years. The amount demanded in the suit was based upon actuarial valuations prepared by JLT's actuaries, plus interest.

On February 28, 1978, a notice of intent to terminate the Plan dated February 22, 1978 was received by the PBGC from JLT.[1] On March 1, 1978, an involuntary petition in bankruptcy was filed against JLT. JLT filed a voluntary petition in this Court pursuant to Chapter XI of the Bankruptcy Act, formerly 11 U.S.C. §§ 701 et seq., on March 13, 1978.[2] Subsequent to the filing of the involuntary petition substantially all of JLT's employees were terminated. JLT and the PBGC entered into an agreement effective as of April 28, 1978, which provided that the parties agreed (1) that the Plan terminated February 28, 1978, (2) that the PBGC be appointed trustee of the Plan pursuant to 29 U.S.C. § 1342, and (3) that the PBGC will have with respect to the Plan all of the rights and powers of a trustee in ERISA or otherwise granted by law.

As of the date of the termination of the Plan on February 28, 1978, the amount of the unpaid contributions owed by JLT to

---

1. 29 U.S.C. § 1341(a) requires plan administrators to notify the PBGC of proposed terminations at least ten days prior to the proposed termination date.

2. All aspects of the debtor's Chapter XI case, including this dispute, are governed by the now-repealed 1898 Bankruptcy Act. The Act was repealed as of October 1, 1979 by Section 401(a) of the Title IV of the 1978 Bankruptcy Reform Act, Public Law 95–598, 92 Stat. 2549. However cases pending under the Bankruptcy Act as of October 1, 1979 will continue to be governed by the Act.

the Plan was $917,140.00. This amount represents the full amount of all unpaid employer contributions to the Plan for the period beginning January 1, 1973 and ending February 28, 1978 together with interest on such unpaid contributions calculated to March 1, 1978. This sum is undisputed and is the amount of the proof of claim filed by PBGC in this bankruptcy proceeding.

Title IV of ERISA established a comprehensive federal system of termination insurance for covered pension plans. It is the response of Congress to the finding that "owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits"[3] under private pension plans. The PBGC was created by Congress to administer this pension plan insurance program. 29 U.S.C. §§ 1301–1381. PBGC's primary function in this statutory scheme is as guarantor of nonforfeitable pension benefits as determined by 29 U.S.C. § 1322. In the instant case, all benefits are nonforfeitable and therefore are insured by the PBGC.

In the event of the termination of a covered plan, the PBGC determines whether the pension plan has sufficient assets to pay all the nonforfeitable guaranteed benefits under the plan. If there are insufficient funds in a covered plan to pay all the benefits guaranteed by the PBGC, the benefits will be paid by the PBGC. In order to finance these payments, the PBGC collects insurance premiums from those employers who maintain covered pension plans. In addition, an employer who maintained a plan which terminates with insufficient funds incurs liability to the PBGC under 29 U.S.C. § 1362[4] and must reimburse the PBGC for the benefits paid in an amount

up to thirty percent of the employers net worth determined within 120 days of the plan termination date.

PBGC has not made a claim against JLT under section 1362 because it has made a determination that such an action would be fruitless due to JLT's insolvency during the relevant 120 day period. However PBGC has filed a claim in this bankruptcy proceeding for the unpaid contributions owed by JLT to the Plan prior to its termination.

The arguments raised by the Creditors Committee and IBEC in their objections to PBGC's proof of claim present two issues for this Court's consideration. The first is whether 29 U.S.C. § 1362 constitutes the sole and exclusive liability of an employer upon termination of an underfunded pension plan. If there is employer liability independent of § 1362, the second issue is the ability of the PBGC to assert this liability in this bankruptcy proceeding.

At the outset of this discussion it should be noted that although PBGC has the ultimate burden of persuasion in sustaining its claim, a verified proof of claim is prima facie evidence of the validity and amount of the claim which requires the objectors to produce enough evidence to overcome PBGC's prima facie case. Rule 301 of the Rules of Bankruptcy Procedure. *See, e.g., Matter of Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977).

The reasons behind Congress's enactment § 1362 are helpful in determining whether an employer is absolved of all further pension liability upon satisfaction of § 1362. Congress, when enacting Title IV of ERISA, was concerned with potential abuses that might occur by intentional termination of underfunded pension plans by

---

**3.** 29 U.S.C. § 1001(a).

**4.** 29 U.S.C. § 1362(b) provides

Any employer to which this section applies shall be liable to the corporation (the PBGC), in an amount equal to the lesser of—
  (1) the excess of—
  (A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over

(B) the current value of the plan is assets allocable to such benefits on the date of termination, or
(2) 30 percent of the net worth of the employer as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.

employers who wished to take advantage of the insurance coverage. Therefore Congress decided to impose limited liability on solvent employers to reimburse the PBGC for guaranteed benefits in excess of trust funds. *See* S.Rep.No.93–833, 93d Cong., 1st Sess. 87, reprinted in 1 *Legislative History* 1063, 1155, Analysis of Amendment No. 496 to S.4, *reprinted* in 2 *Legislative History 1723–24.* Employer liability was limited to thirty percent of net worth because of Congress' concern for the financial well being of employers and the desire to continue to encourage the voluntary establishment of private pension plans. *See* 29 U.S.C. § 1302(a)(1); H.R.Rep.No.93–807, 93d. Cong., 2d Sess. 8–9, reprinted in *2 Legislative History* 3115, 3128–29.

While it is true that an insolvent employer generally has no liability to the PBGC with respect to an underfunded terminated pension plan other than under section 1362, the objectors reliance on this section misconceives the basis of the claim asserted by the PBGC and the effect of ERISA upon its validity.

JLT's obligation to make the contributions at issue existed prior to the enactment of ERISA[5] as it arose from the Pension Plan adopted and established by JLT pursuant to the collective bargaining agreement negotiated between the employer and the UAW.[6] A promise of a pension, once it is adopted by an employer in a plan, has been held to constitute an offer, which upon performance of the required service by the employee becomes a binding obligation upon the employer. *Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4–5 (1st Cir. 1978) (applying Mass.Law.) *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). In the absence of ERISA, JLT's contractual promise contained in the Plan to make these annual payments is a binding obligation on JLT enforceable by the Plan's beneficiaries. Under the Bankruptcy Act, the employees' right to these payments is treated as a general unsecured claim. *See U.S. v. Embassy Restaurant, Inc.*, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959).

Contrary to the objectors contention, the enactment of ERISA did not eradicate JLT's contractual obligation to make these payments. In fact this contractual obligation became a statutory one as well under 29 U.S.C. § 1082. This section imposes minimum funding standards for a covered plan and requires annual contributions in amounts necessary to cover currently earned pensions and costs and an amortized portion of unfunded liability attributable to both pensions based on past services and experience losses.

The limitation of employer liability contained in ERISA is not applicable to employees contractual rights under a pension plan. Section 1362 provides that an employer is liable to the PBGC upon termination of an underfunded pension plan for the difference between the terminating plan's assets and the present value of guaranteed benefits, minus any recovery that the PBGC may have under § 1362. Section 1362 only speaks to the question of employer liability to PBGC, and does not address the issue of an employer's liability to his employees under a pension plan. ERISA specifically provides that "[a] civil action may be brought

**5.** ERISA generally became applicable in plan years beginning after September 2, 1974, 29 U.S.C. § 1060.

**6.** The Plan provides, in relevant parts, that: Section XIII contributions (1) All contributions to provide benefits under the Plan shall be made by the Company (JLT).... The Company's contributions will be made to the trust from time to time in amounts sufficient to insure the successful operation of the Plan on a sound actuarial basis.... (2) Except to the extent required by Article II of the Agreement the Company does not guarantee to fund any of the benefits under the Plan....

Article II § 3 provides: (3) During the term of this Agreement, the Company shall, from time to time, pay to the Trustee contributions in such amounts as will maintain the Plan on a sound actuarial basis and afford employees the benefits specified herein.... Contributions made by the Company to the Trustee in accordance with the provisions of this Section 3 shall be in complete discharge of the Company's financial obligation under this Plan during the term of this Agreement.

by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Courts which have considered the issue have consistently held that § 1362 does not apply to or limit an employer's liability to its employees under a pension plan. *Murphy v. Heppenstall Company,* 635 F.2d 233 (3rd Cir. 1980), *cert. denied Heppenstall Co. v. Murphy,* —— U.S. ——, 102 S.Ct. 999, 71 L.Ed. 293 (1982); *In re M & M Transportation Company,* 3 B.R. 722, 23 C.B.C. 196 (S.D.N.Y.1980); *In re Alan Wood Steel Company,* 4 B.C.D. 921 (Bkrtcy.E.D.Pa. 1978).

While JLT's liability for these delinquent payments is thus unaffected by ERISA, the Creditors Committee and IBEC challenge PBGC's assertion of this liability in this bankruptcy proceeding. The objectors contend that § 1362 is the sole and exclusive remedy available to the PBGC against an employer for an underfunded pension plan. These objections again are based upon a misunderstanding of ERISA and bankruptcy law.

PBGC is asserting this claim, not as a guarantor with a cause of action under Section 1362, but as trustee of the pension plan. ERISA provides that the PBGC is authorized to obtain the appointment of a trustee for a terminated plan (the "ERISA Trustee"). 29 U.S.C. § 1342. The ERISA trustee maybe appointed by a district court or by agreement between the PBGC and the administrator of the terminating pension plan. In the instant case, the PBGC replaced the Bank as trustee of the pension plan by an agreement executed between the Pension Plan Board, JLT's president and the PBGC. Subsequently, the agreement was executed by Robert F. Stahl, Jr., as representative of the debtor-in-possession, as authorized by order of this Court dated April 7, 1978. The appointment of the PBGC as ERISA trustee is not mandatory as anyone may be appointed trustee. 29 U.S.C. § 1342(b) and (c).

As an ERISA trustee, the PBGC's primary responsibility is to collect and liquidate plan assets for the purpose of (1) allocating such assets among plan participants and (2) determine the amount by which guaranteed benefits exceed available Plan assets so that the PBGC will be able to determine its guarantor liability. In order to accomplish these purposes, ERISA delineates the duties of an ERISA trustee and bestows substantial powers upon him.

An ERISA trustee is charged with the duties of a bankruptcy trustee appointed under section 47 of the Bankruptcy Act, formerly 11 U.S.C. § 75. Among the responsibilities of a Bankruptcy trustee is the duty to "collect and reduce to money the property of the estates for which they are trustees, under direction of the court, and close up the estates as expeditiously as is compatible with the best interests of the parties in interest...." Section 47(a)(1) of the Bankruptcy Act, formerly 11 U.S.C. 75(a)(1). Further an ERISA trustee has the duties of a fiduciary under 29 U.S.C. § 1104(a)(1). This section provides that

A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ————

(A) for the exclusive purpose of:

(i) providing benefits to participants and beneficiaries; and

(ii) defraying reasonable expenses of administering the plan....

The powers of an ERISA trustee are defined in 29 U.S.C. § 1342. Among these are the powers

(A) (i) to do any act authorized by the plan or this subchapter [IV] to be done by the plan administrator or any trustee of the plan;

(ii) to require the transfer of all (or any part) of the assets ... and records of the plan to himself as [ERISA] trustee....

(B) (ii) to collect for the plan any amounts due the plan;

\*     \*     \*     \*     \*     \*

(v) to commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan. . . .

29 U.S.C. § 1342(d)(1)(A) and (B).

These duties and powers of an ERISA trustee mandate the collection of assets of a terminated pension plan. JLT's statutory and contractual obligation to make these pre-termination payments is an asset of the Plan which an ERISA trustee must be able to assert in this bankruptcy proceeding. As guarantor, the PBGC is only liable to the extent that plan assets are insufficient to satisfy the nonforfeitable benefits guaranteed by the PBGC. An ERISA trustee would be delinquent in his fiduciary responsibilities to the plan beneficiaries if he did not attempt to recover this asset. In a situation where the ERISA trustee is anyone other than the PBGC, a result specifically provided for in 29 U.S.C. § 1342(b) and (c), failure to do so could result in the guarantor's (PBGC) refusal to reimburse the beneficiaries for this uncollected Plan asset. Ultimately, such inaction could bring about the imposition of personal liability upon the ERISA trustee.[7]

To hold that section 1362 governs the PBGC when it is serving in the capacity of ERISA trustee is to render ERISA nonsensical. Any ERISA trustee other than the PBGC would be able to assert this claim, because the net worth limitation contained in § 1362 only applies to the PBGC. There is no basis in the statute or legislative history of ERISA to support a finding that the PBGC, as an ERISA trustee, has any less powers than a non-PBGC trustee. Nor is there any basis to conclude that a PBGC ERISA trustee is exempt from the duties imposed upon all other ERISA trustees by § 1342.

The objectors contention that the PBGC, as ERISA trustee, is somehow barred from asserting this claim because all benefits are guaranteed is thus directly contravened by the duties imposed upon all ERISA trustees under § 1342. Further, in the context of

bankruptcy proceedings relating to the allowance and disallowance of claims, the existence of a guarantor who is secondarily liable has no effect on the validity of a creditor's proof of claim against the primary obligor on the underlying debt. PBGC's proof of claim in this proceeding is a valid unsecured claim.

This result is not inconsistent with the Congressional purpose behind the enactment of § 1362. Congress intended to impose limited employer liability upon termination of an underfunded pension plan to encourage the voluntary establishment of private pension plans. This intention is understandable because many pension plans are terminated due to economic conditions beyond the control of employers.

However a distinction clearly should be made between the liability of an employer who has met his contractual and statutory obligations prior to a plan's termination and the liability of an employer who was delinquent prior to the plan termination date. In this latter situation, the application of § 1362 would only serve to reward the non payment of pension contributions prior to termination and encourage employers to take advantage of the plan insurance program. This interpretation would impose undue costs upon those who fund the plan termination insurance program and would be contrary to Congressional intent.

Accordingly, it is

ORDERED:

That the PBGC has a valid unsecured claim in the amount of $917,140.00.

---

**7.** 29 U.S.C. § 1109 imposes personal liability upon a fiduciary for breach of the duties and obligations contained in ERISA.