**In re P.J. NEE COMPANY, Debtor.**

**Bankruptcy No. 82–1–0008.**

United States Bankruptcy Court,
D. Maryland.

Dec. 29, 1983.

Charles Docter, Kensington, Md., Trustee of the estate.

Daniel Litt, Washington, D.C., Maryland Nat. Bank.

### MEMORANDUM OF OPINION

(Order Upon Priority Status of Bank)

PAUL MANNES, Bankruptcy Judge.

P.J. Nee Company (P.J. Nee), an old and established furniture company, filed its Chapter 7 petition on January 5, 1982, and went out of business abruptly. In the months prior to the entry of the order for relief, numerous customers made deposits and payments in full for the purchase of furniture that was never delivered. Only the herculean efforts of the Montgomery County Department of Consumer Affairs prevented the loss from becoming more widespread. That office, together with the

trustee, arranged for other dealers and some manufacturers to fill the orders at substantial savings to the purchasers.

A number of purchasers who had made their purchases or deposits by use of bank credit cards [1] availed themselves of the protection of the Consumer Credit Protection laws found in Chapter 41 of Title 15 of the U.S.Code, 15 U.S.C. § 1601, *et seq.,* and the implementing regulations in 12 CFR Part 226. Substantial protection was provided by Congress to the consumer by the 1974 amendments to the Truth-in-Lending Act to comply with the announced purpose "to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. Those customers of P.J. Nee who had made their purchases by use of bank credit cards and then made appropriate claims to the issuer of the card were spared the fate of hundreds of other customers who were left holding a bag containing only a § 507(a)(5) priority claim of $900.00.

The instant case concerns the effort of Maryland National Bank (MNB) to assert a priority claim under 11 U.S.C. § 507(a)(1). As MNB states its position in its memorandum:

"A.   *Priority Should be Granted to MNB's Loan to P.J. Nee Co.*

In determining the priorities over property of a debtor's estate, first priority is granted to administrative expenses. 11 U.S.C. § 507(a)(1). Such expenses include, among other things, 'the actual, necessary costs and expenses of preserving the estate . . .' 11 U.S.C. § 503(b)(1)(A)."

The alleged administrative expense is MNB's refunding to the individual customers of the deposits made through credit cards processed by MNB.

The trustee opposes the asserted priority, noting that of the $14,331.50 claimed, $10,038.24 constituted prepetition debt and $4,293.26 postpetition debt. The claim arises by virtue of a Member Agreement between P.J. Nee and MNB pursuant to which the P.J. Nee company was able to process MasterCard System and Visa System credit card charges. That agreement provided for the handling of "billing errors" as provided under 15 U.S.C. § 1666(b):

§ 1666.   *Correction of billing errors*

\*       \*       \*       \*       \*       \*

(b) *Billing error.* For the purpose of this section, a "billing error" consists of any of the following:

(1) A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.

(2) A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.

(3) A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction.

(4) The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.

(5) A computation error or similar error of an accounting nature of the creditor on a statement.

(6) Any other error described in regulations of the Board.

and in 12 CFR § 226.13(e):

(e) *Procedures if billing error occurred as asserted.* If a creditor determines that a billing error occurred as asserted, it shall within the time limits in paragraph (c)(2) of this section:

(1) Correct the billing error and credit the consumer's account with any disputed amount and related finance or other charges, as applicable; and

---

**1.**  *See generally,* Sinclair, "Consumer Update—Using Credit Cards Wisely," *The Washington*   *Post,* November 3, 1983, p. Md. 2.

(2) Mail or deliver a correction notice to the consumer.

Under the Member Agreement between P.J. Nee and MNB, where a billing error had occurred the parties agreed:

"member [P.J. Nee Co.] shall pay ... [MNB] the full amount of any sales draft upon the ... return of goods ... Bank may charge back any sales draft in connection with a disputed transaction, and member shall pay Bank for such sales draft."

Thus, when the P.J. Nee customers disputed their charges, MNB was compelled to reimburse them and thereafter retrieve these funds immediately from its "member." MNB characterizes this as an "involuntary loan" that would entitle it to priority.

■ The priority of § 507(a)(5) was established for the first time in the 1978 Code. As described in King, *Collier on Bankruptcy,* 15th ed., ¶ 507.04[5], the priority reflected the solicitude of Congress for the problems encountered by consumers who made deposits with retailers that later became bankrupt. As the House Judiciary Report noted:

A consumer that pays money on a layaway plan or as a deposit on merchandise, or that buys a service contract or a contract for lessons or a gym membership, is a general unsecured creditor of the business to which he has given his money. Very few consumers are aware of their status as general unsecured creditors. If the merchant involved files under the bankruptcy laws, the consumer is usually left holding the bag. Though he assumed his deposit was tantamount to a trust fund, he gets nothing from the estate of the debtor, because the assets available provide little return to unsecured creditors. Because of his ignorance and his inability to bargain with a retail merchant, he is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do. A recent example is the W.T. Grant bankruptcy. All customers who held "Grant's script" have essentially lost their deposits.

H.R.Rep. No. 595, 95th Cong. 1st Sess. at 188 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6148–6149. Clearly the intention of Congress was to protect the individual creditor who was unable to protect himself and who was the last to receive the news of an impending insolvency.

■ The court finds no assignment of the priority claims by the consumers to MNB. MNB stands as a subrogee and not as an assignee of the consumers. The message of § 507(d) is unambiguous:

§ 507. *Priorities*

\* \* \* \* \* \*

(d) An entity that is subrogated to the rights of a holder of a claim of a kind specified in subsectin (a)(3), (a)(4), (a)(5), or (a)(6) of this section is not subrogated to the right of the holder of such claim to priority under such subsection.

Cf. *In re Missionary Baptist Foundation of America, Inc.,* 12 B.R. 570 (Bkrtcy.N.D.Tex. 1981), *aff'd,* 667 F.2d 1244, 1246–1247 (5th Cir.1982) (Assignment of wage claims held not to be subrogation).

The reimbursement by MNB to the consumers was pursuant to the mandate of federal law. MNB is in fact a surety of the performance of the retail merchant. MNB does not stand in the shoes of the consumer, but rather as an unwilling creditor in its own right. MNB had the power to require a bond from P.J. Nee before it entered into the Member Agreement. It chose not to do so. Nor has Congress legislated any priority for it. The granting of a priority requires the clear expression of Congressional intent. *See In re Lorber Industries of California,* 675 F.2d 1062, 1068 (9th Cir.1982). There is no such intent here.

■ The claim of MNB is not an administrative expense of the debtor under 11 U.S.C. § 503(b). The bank's prepetition claim falls into none of the statutory classifications. The postpetition payment may not be described as "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." Nothing was furnished

by MNB for the estate. The bank was doing what the law required it to do—to vindicate the rights of its own client. Its client could be either a natural person or an organization. 15 U.S.C. § 1602(d). The priority of 507(a)(5) is limited to individuals.

Even if the court had the discretion to grant MNB priority status, which it clearly does not, the court does not see the public policy mandate urged by MNB. The bank upheld its contract obligations not by any moral judgment but because the law compelled it to do so. When the bank dealt with P.J. Nee, the bank risked the latter's insolvency. Having taken that business risk in entering into the relationship with P.J. Nee, why should MNB be placed ahead of all other unpaid suppliers?