### In re COLUMBIA PACKING COMPANY, Debtor.

**Bankruptcy No. 83–00260–HL.**

United States Bankruptcy Court, D. Massachusetts.

Feb. 22, 1985.

See also 35 B.R. 447.

Richard E. Mikels, P.C., Whitton E. Norris, III, Peabody & Brown, Boston, Mass., for debtor.

Edward Thomas Veal, Act. Gen. Counsel, James N. Dulcan, Asst. Gen. Counsel, Stephen D. Schreiber, Trial Atty., Angela J. Arnett, Atty., Pension Benefit Guar. Corp., Trustee of Columbia Packing Co. Employees Pension Plan, Legal Dept., Washington, D.C., for Pension Benefit Guar. Corp.

## MEMORANDUM ON PENSION BENEFIT GUARANTY CORPORATION'S PRIORITY AND ADMINISTRATIVE CLAIM

HAROLD LAVIEN, Bankruptcy Judge.

Stripped of all of its sophistication, the objective of the Employment Retirement Income Security Act of 1974 (ERISA), Pub.L. No. 93–406 88 Stat. 832, 29 U.S.C. §§ 1001–1381, is the protection of the employee's pension rights from underfunded plans. As noted by Congress regarding the enactment of ERISA:

> [A] major issue in private pension plans relates to the adequacy of plan funding. "Funding" refers to the accumulation of sufficient assets in a pension plan to assure the availability of funds for payment of benefits due to the employees as such obligations arise. Today, funding of pension plans for the limited and specific purpose of qualifying for tax benefits permitted by law for contributions made is governed by statutory and regulatory requirements which are under the jurisdiction of the Internal Revenue Service (I.R.S. Code of 1954, Sections 401–404). The minimum funding rules (Treasury Regulations, Sections 1.401–404(c) (1963)) require an employer to make contributions to a pension fund, qualified by the Internal Revenue Service, of amounts at least equal to the pension liabilities being created currently, and the interest due upon those amounts of monies which reflect unfunded accrued liabilities. The inherent weakness of this required minimum funding is that the employer is not required under law to make payments toward the principal of the unfunded accrued liabilities. Without mandatory funding of past service liabilities, a pension plan may never be in a financial posture to meet its pension obligations to its employees.

> The pension plan which offers full protection to its employees is one which is funded with accumulated assets which at least are equal to the accrued liabilities, and with a contribution rate sufficient to maintain that status at all times. However, since plans are revised and amended to provide new benefits which create new and different liabilities for the plan, opponents of compulsory funding argue that it is unrealistic to expect that plans maintain a full funding status at all times. The same opposition is voiced for new plans, which invariably assume a large unfunded liability at the outset of the plan, due to the granting of credit for past service by employees to the employer.

> The ineffectiveness of funding requirements was acknowledged in the President's Cabinet Committee Report of 1965, when it concluded that "... the minimum standards for funding under present tax law do not assure adequate funding. The setting of standards for adequate funding therefore becomes an important public concern." (Public Policy and Private Pension Programs, 1965, pp. 50–51). The promise and commitment of a pension can be fulfilled only when funds are available to pay the employee participant what is owed to him.

Without adequate funding, a promise of a pension may be illusory and empty. S.Rep. No. 127, 93 Cong.Sess., reprinted in [1974] U.S.Code & Cong.Ad.News 4639 at 4838; *see also, Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 630 F.2d 4, 7 (1st Cir.1980).

Accordingly, in 1974, ERISA was enacted to establish requisite annual employer contributions of an actuarial computed amount to enable a plan to meet present and future vested obligations. 29 U.S.C. § 1082; *see also*, 26 U.S.C. § 412. Further, the Pension Benefit Guaranty Corporation (the "PBGC") was established:

(1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,

(2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and

(3) to maintain premiums established by the corporation under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter.

29 U.S.C. § 1302.

If a pension plan is fully funded, then, at termination, for any reason, each employee will be able to receive the previously agreed pension entitlement from the funds in hand. When a plan terminates, the PBGC computes the liability of the plan to the employees and the necessary funding to carry that liability. When the fund and the computed liability are in balance, the millennium is achieved. Occasionally, the plan is over funded and the excess is returned to the employer. The evil the law seeks to remedy, and the most troublesome situation, is where the employer's contributions to the fund are insufficient to meet the plan's liability. This occurs as a result of several different factors and does not necessarily indicate any misfeasance on the part of the employer.[1] Regardless of why it occurs, the employer is responsible for the short fall. In the event that the short fall is not redressed by the employer, the PBGC provides the funds[2] and seeks to recover the same from the employer.

In the case at bar, Article III of the Columbia Packing Company Employees Pension Plan, as well as 26 U.S.C. § 412 and 29 U.S.C. § 1082, sets forth the requirements for annual contributions to the trust fund in such amounts, as actuarially determined, that would maintain the trust fund on an actuarially sound basis and in accordance with applicable federal and state laws. Columbia failed to make any payments after the fiscal year ending October 31, 1981. The debtor filed its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on February 28, 1983. On September 15, 1983, substantially all of the debtor's assets were sold pursuant to a notice of intended sale. The pension plan was terminated by the debtor on September 16, 1983. On April 6, 1984, the Court confirmed a liquidating Chapter 11 plan that, substantially, provided the debtor with the responsibility of liquidating any remaining assets, pursuing preferences, and objecting to claims. The PBGC claims unpaid annual contributions from the period November 1, 1981 to September 16, 1983, of $300,089, based on an agreed minimum annual contribution for that period, of $156,479. Columbia's pension fund had a short fall of approximately $1,015,000. PBGC filed a claim for the $1,015,000 which, by agreement with the debtor-in-possession, was withdrawn, because the debtor was insolvent and, therefore, the claim could not be allowed under the 30% limitation of net worth. 29 U.S.C. § 1362, *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 711 F.2d 1085 (1st Cir.1983). Settlement of that claim, however, did not resolve the PBGC claims for unpaid contri-

---

**1.** For example, retroactive changes in the benefit plan and changes in actuarial assumptions.

**2.** All employers pay, in addition to their annual contributions, an insurance premium to provide sufficient revenue for the PBGC to carry out its functions. 29 U.S.C. § 1306.

butions, *In re J.L. Thomson Rivet Corp.*, 19 B.R. 385 (Bankr.D.Mass.1982).

The parties are in agreement that the PBGC has a valid claim for the unpaid contributions of $300,089. The dispute is whether any part of the agreed unpaid contribution is entitled to any priority status under 11 U.S.C. § 507(a)(1) or (4). Section 507(a)(1) & (4) reads:

§ 507. Priorities.

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.

(4) Fourth, allowed unsecured claims for contributions to employee benefit plans—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by such plan multiplied by $2,000; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

Specifically, at issue is the interpretation of the phrase "arising from services rendered within 180 days before the date of the filing of the petition...." There is no dispute as to the relevance of this section, the dispute is the application.

The PBGC takes a convenient and simplistic approach—namely, that the debtor is bound to pay an appropriate proportion (180/365) of the annual contribution which would have been presumed to be earned in the 180 days preceding the filing of the petition.

The debtor disagrees. It notes that the minimum annual contribution consists primarily of two components—normal cost and past service cost. Normal cost is "the annual cost of future pension benefits and administrative expenses assigned, under an actuarial cost method, to years subsequent to a particular valuation date of a pension plan," 29 U.S.C. § 1002(28); that is, the theoretical cost of future pension benefits earned during the actual period in question—in this case, the administrative and priority periods. Furthermore, past service cost is comprised of two elements: (1) the cost of retroactive benefits credited to employee service prior to the inception of the plan; and (2) the cost arising from retroactive increases in the benefit rates because of pension plan amendments. The debtor does not dispute that normal cost is an appropriate priority expense. It does, however, dispute the applicability of any priority due to past service cost or to normal costs for employees who did not work during the priority period. In short, it argues that past service costs are neither attributable nor incurred by workers during the priority periods but, rather, relate to work preceding the priority periods.[3] Therefore, the debtor argues, the past service costs should not be paid as a priority expense. Furthermore, the debtor argues that the PBGC claims contributions for employees who did not work during all or part of the priority periods—that is, the PBGC claim is based upon an annual minimum contribution which utilized 201 employees, as opposed to an average of 137 employees that actually worked during the priority periods in question.

Congressional legislation often focuses on separate problems without fully contemplating their inter-reaction, such as ERISA legislation protecting employee pension rights and bankruptcy legislation maximizing the estate and the equitable distribu-

---

**3.** *See* Novikoff & Polebaum, *Pension-Related Claims in Bankruptcy Code Cases,* 40 The Business Lawyer 373, 407 (Feb. 1985).

tion to creditors.[4] Conflicts are inevitable, and it is the Court's function to blend, if possible, the Congressional intent with the realities of the situation.

■ In bankruptcy, priorities derogate from the basic purpose of a maximum pro rata distribution to unsecure creditors. No matter how worthy the objective of each priority, priorities inevitably reduce the funds available for general unsecured creditors. These creditors, in a real sense, are discriminated by this system of preferring one unsecured creditor over another. Accordingly, priorities should be construed strictly.

The theme of equality of distribution among similarly situated creditors is part of the warp and woof of bankruptcy administration. See Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219 [61 S.Ct. 904, 907, 85 L.Ed. 1293] (1941), rehden 313 U.S. 600 [61 S.Ct. 1107, 85 L.Ed. 1552] (1941). Where, as a matter of legislative policy, Congress has chosen to situate creditors differently, it has done so plainly. Section 64a of the Act represents the limits of Congress' tenderness for certain special classes. American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, 280 F.2d 119 (2d Cir.1960); United States v. National Furniture Corp., 348 F.2d 390 (8th Cir.1965); 3A Collier on Bankruptcy (14th ed.) Para. 64.02. But the special treatment accorded the classes described in Section 64a does not mean that within those carefully defined classes, a court is free to fashion priorities within those priorities. Nor can some reservoir of equitable jurisdiction support judicial revision of the words Congress wrote in recognition of its broad policy. In re Columbia Ribbon Co., 117 F.2d 999 (3rd Cir.1941); United States v. Killoren, 119 F.2d 364 (8th Cir.1941), cert. denied 314 U.S. 640 [62 S.Ct. 78, 86 L.Ed. 513] (1941); Wheeling Valley Coal Corp. v.

Mead, 171 F.2d 916 (4th Cir.1949); 1 Collier on Bankruptcy (14th ed.) Para. 2.09. In the Matter of Texlon Corporation, 3 B.C.D. 1013, 1016 (Bankr.S.D.N.Y.1977). See also, Nathanson v. N.L.R.B., 344 U.S. 25, 28–29, 73 S.Ct. 80, 82–83, 95 L.Ed. 23 (1952); United States v. Embassy Restaurant, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959); Sampson v. Imperial Paper Corp., 313 U.S. 215, 219, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); In re Mammoth Mart, Inc., 536 F.2d 950, 953 (1st Cir.1976); In re Lorber Industries of California, Inc., 675 F.2d 1062, 1066 (9th Cir.1982); In re P.J. Nee Co., 36 B.R. 609, 611 (Bankr.D.Md. 1983).

PBGC cites the two leading cases that express a basic philosophical difference in the interpretation of this concept of earned during the priority period. The earlier case of Straus-Duperquet, Inc. v. Local U. No. 3, 386 F.2d 649 (2d Cir.1967), considered and not followed in In re Mammoth Mart, Inc., 536 F.2d 950 (1st Cir.1976). The analysis of the First Circuit is binding on this Court as a matter of law and, as the author of the original bankruptcy court opinion, it is one I readily follow. Here, the pension rights were earned over not only the entire period of the plan, but over the entire period of employment subject to a 25-year limitation. However, each year's additional benefit is based on having worked that year. That year's minimum contribution is actually based on that year's added cost of the benefits earned because of that year's work, even though, of course, a component of those benefits is past service. It is obvious that, in some equitable fashion, only the contribution earned within the 180 days can be entitled to a § 507(a)(4) priority. In re Crouthamel Potato Chip Co., 43 B.R. 934 (Bankr.E.D.Pa.1984). The section, itself, expressly recognizes that. After all, it was adopted in 1978, well after ERISA, and, explicitly, limits itself to "employee benefit plans." Certainly, a pension is a benefit plan.

---

**4.** Of course, fresh start is the other main bankruptcy objective, but it is a fresh start for the debtor, not the creditors.

On a *theoretical* level, the Court has little doubt that debtor's counsel is correct regarding his analysis of past service cost. However, debtor's counsel disregards the reality of the situation. When a pension plan is established, rarely, if ever, is the fund for retroactive benefits fully funded.[5] It is expected that funds for past service liability will be provided in the future as an ongoing expense of doing business and as a direct element of labor. In short, although a portion of pension costs are attributable to retroactive benefits and past service, payment, as a practical matter, is considered a present cost of doing business.

■ This view is supported by the legislative history of 11 U.S.C. § 507(a)(4):

> Paragraph (4) overrules *United States v. Embassy Restaurant*, 359 U.S. 29 [79 S.Ct. 554, 3 L.Ed.2d 601] (1959), which held that fringe benefits were not entitled to wage priority status. *The bill recognizes the realities of labor contract negotiations, under which wage demands are often reduced if adequate fringe benefits are substituted.* The priority granted is limited to claims for contributions to employee benefit plans such as pension plans, health or life insurance plans, and others, arising from services rendered after the earlier of 6 months before the bankruptcy case and the date of cessation of the debtor's business. The dollar limit placed on the total of all contributions payable under this paragraph is equal to the difference between the maximum allowable priority under paragraph (3), ([$2000] times the number of employees covered by the plan) less the actual distributions under paragraph (3) with respect to those employees. (emphasis added)

H.R.Rep. No. 595, 95th Cong., 1st Sess. 357 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6313. In short, the legislative history recognizes that present wages are comprised of elements other than salary. The increase in salaries foregone, however, in a realistic sense, cannot be measured merely in the cost of future *benefits* directly incurred (debtor's counsel's argument), but, rather, the payment actually made—in this case, including a share of past service liability as computed in the required annual minimum contribution. Accordingly, I find that past service cost is an element of a priority claim. I rule that the appropriate application of the Section 507(a)(4) priority to the PBGC claim is to allow priority to the extent that the minimum actuarially computed annual contribution can be attributed to the 180 days, and did not exceed $2,000 times the number of employees, less any § 507(a)(3) or (4) other benefits paid the employees.

■ That, however, does not conclude the matter. Consideration must be given to the debtor's other contention that the PBGC claim is based upon the average employment of 201 employees when only an average of 137 employees were employed during the periods in question. To illustrate, assume there was a minimum annual contribution actuarially computed based upon 500 employees for the year, and six months into the year, all but ten employees were dismissed. Accordingly, only ten employees worked the remaining six months. Further, assume no bad faith and the business did not legally terminate. Would anyone expect approximately one-half of the full minimum annual contribution to receive priority? And, if it were and the plan had been fully funded up to that last year, that would clearly constitute overfunding. Here, where the number of employees are a primary factor in determining the pension contribution and the statute expressly provides priority status for "services rendered," 11 U.S.C. § 507(a)(4), and for the "actual, necessary costs and expenses of preserving the estate," 11 U.S.C. § 503(b)(1)(A), it would be inappropriate for the Court to adopt an amount based upon an assumed number, rather than the actual number. In this

---

5. Under the plan, in this case, past service liability was allowed to be funded by annual installments over a period of up to 40 years. 29 U.S.C. 1082(b)(2)(B); *but see* 29 U.S.C. 1084, 10-year extensions are possible.

regard, it is the PBGC which has disregarded the reality of the circumstances.[6]

In the case at bar, the annual minimum annual contributions were determined in an Actuarial Valuation report prepared in 1981. That report compares, as of a specific date, the value of assets in the trust fund with the value of future benefits anticipated to be earned under the plan and provides a schedule to fund the unfunded benefits in the future, based upon the number of employees at that time, in this case, 201. However, a valuation is only required to be produced once every three years, and, if no actuarial valuation is done in any particular year, then the minimum funding contribution is determined by utilizing the most recent actuarial valuation report. However, as noted above, Columbia did not employ 201 employees during the periods in question but, rather, an average of 137.

Therefore, some adjustment must be made. The starting point is what would have been the actuarially computed minimum annual contribution of $156,479 which should be multiplied by 180/365 to provide a priority that would be accurate assuming a level work force. That assumption not being the case, a formula to take into account the size of the work force must be devised. Presently, I can conceive of three simple and economical alternatives other than a laborious individualized computation for each employee:

(1) Utilize the daily average payroll for the valuation report period as the denominator and average daily payroll during the priority 180 days as the numerator and multiply that fraction by the previous computed maximum priority.

(2) Utilize the daily average of plan years[7] held by workers employed during the valuation report period as the denominator and total average number of plan years held by workers employed during the priority 180 days as the numerator and multiply that fraction by the previous computed maximum priority.

(3) Take the daily average number of employees during the valuation report period as the denominator and the average number of employees over the priority 180 days as the numerator and multiply that fraction by the previous computed maximum priority.

■ I propose to use the third method because it is not only the easiest to compute, but because the benefits under the plan are not based upon wages but, rather, on years worked, per employee. Further, the actuarial computation of the annual minimum contribution is based on the added cost *per employee* per year. Of course, this, itself, is largely an estimate—admittedly, the best available but still an estimate of life expectancy and the value of money. Thus, to recapitulate, the § 507(a)(4) priority is computed by, first, multiplying the minimum required annual contribution of $156,479 by 180/365 and, then, multiplying the result by 137/201. The result cannot be larger than $2,000 times 137 less any benefits previously paid under § 507(a)(3) or (4).

■ Likewise, to determine the post-filing administrative claim,[8] I start with the

---

**6.** At trial, the PBGC contended that its procedures in determining its priority claims had been utilized in over 300 bankruptcies. Without intending to put too fine a point to it, I would refer to Footnote No. 31 of *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 79, 102 S.Ct. 2858, 2875, 73 L.Ed.2d 598 (1982).

**7.** While it is true that there may be workers with more than the 25-year limit whose added years don't add to the general multiple, additional years may give them an increase because of increased rates, etc., the proportion is not likely to be effected because, presumably, they are the most experienced and valuable, and so would continue into the last six months and

balance off. Besides, our objective is to be as accurate as we can within the practical limits of what is, at best, an approximation of the statistically determined minimum contribution.

**8.** 11 U.S.C. § 503. Allowance of Administrative Expenses

(b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

minimal annual contribution times the ratio of the number of days from the filing of the bankruptcy petition to the termination of the pension plan (February 28, 1983 to September 16, 1983) to 365 days. I multiply that result, which would be the maximum possible administrative claim by a ratio, the numerator of which would be the average number of employees during the post-filing period, and the denominator being the 201 persons on which the actuarial minimum annual contribution was based.

The PBGC, and the debtor for that matter, has argued that the rule of *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976), is applicable here. Although a Bankruptcy Act case, the analysis of the First Circuit is still relevant and binding on this Court. The PBGC, however, has misapplied that case. There, the Court dealt with severance pay owed directly to individuals and ruled that priority in bankruptcy "depends upon the extent that the *consideration supporting* the [claim] was both supplied and beneficial to the debtor-in-possession in the operation of its business" during the priority period. (emphasis added) *Id.* at 954. Here, where the statute provides priority only for "services rendered" and the "necessary costs and expenses of preserving the estate," the rationale of *Mammoth Mart* manifests that any expense incurred for priority purposes be based upon the actual number of employees rather than a presumed amount.

The other cases cited by the PBGC and the debtor are interesting, but deal with materially different issues, and no purpose would be served by prolonging this opinion with a detailed report of dissimilarities.

Columbia is to prepare and submit an order based on the above findings and rulings within 20 days, supplying a copy to PBGC, who shall have 10 days to comment on any disagreements with the debtor's computations or interpretation of the Court's findings and rulings.