**In re HLM CORPORATION, Debtor.**

**EMPLOYERS INSURANCE OF WAUSAU, Appellant,**

v.

**James RAMETTE, Trustee of the Bankruptcy Estate of HLM Corporation, Appellee.**

**Civ. No. 3–94–1312.
Bankruptcy No. 4–92–3790 NCD.**

United States District Court,
D. Minnesota,
Third Division.

Nov. 14, 1994.

Robert A. Judd, Wagner, Falconer & Judd, Ltd., Minneapolis, MN, for appellant.

Randall L. Seaver, Morris, Fuller & Seaver, P.A., Minneapolis, MN, for appellee.

1. United States Bankruptcy Judge Nancy C. Dreher.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Before the Court is Appellant's appeal from an Order of the United States Bankruptcy Court.[1] The Order sustained the Appellee's objection to Appellant's priority claim and determined that unpaid workers' compensation premiums are not entitled to priority status under 11 U.S.C. § 507(a)(4).

### Background

Appellant Employers Insurance of Wausau ("Wausau") is a participating insurance carrier under the Minnesota Assigned Risk Plan ("ARP"). The ARP provides workers' compensation insurance for Minnesota employers who are unable to obtain coverage through traditional market channels.

On October 18, 1986, Wausau began providing workers' compensation insurance to HLM Corporation ("Debtor") pursuant to the Minnesota ARP. The Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code ("the Code") on May 21, 1992. On June 25, 1992, the proceedings were converted to a Chapter 7 proceeding and the Appellee was appointed trustee.

On August 20, 1993, Wausau filed a proof of claim (Claim No. 20) against the Debtor in the amount of $490,479.00. This claim represents the pre-petition workers' compensation premiums due for three relevant policy periods. Wausau maintains that $149,704.00 of the claim amount was the premium incurred within 180 days from the date the Debtor filed its bankruptcy petition. Wausau contends that this portion of the unpaid premiums is an unsecured priority claim under § 507(a)(4) of the Code because it constitutes "contributions to an employee benefit plan." On January 20, 1994, the Trustee filed an objection to Wausau's claim on the grounds that the amount claimed was inaccurate, and that the claim, regardless of amount, was not entitled to priority status under § 507(a)(4). The Trustee contends that the claim is a general unsecured claim for unpaid insurance premiums.

A hearing on the Trustee's objection was held before the bankruptcy court on February 23, 1994. On March 18, 1994, the bankruptcy court issued its Order sustaining the Trustee's objection, *In re HLM Corp.*, 165 B.R. 38 (Bankr.D.Minn.1994), holding that unpaid workers' compensation premiums are not entitled to priority under § 507(a)(4) of the Code; accordingly the bankruptcy court did not address whether the claimed amount was calculated properly. This appeal followed.

This Court has jurisdiction to hear Wausau's appeal pursuant to 28 U.S.C. § 158(a) and 28 U.S.C. § 1334(a).

## Discussion

■ The facts in this case are not disputed. The narrow legal issue before the Court is whether § 507(a)(4) entitles Wausau to a priority claim for unpaid pre-petition workers' compensation insurance premiums earned within 180 days prior to the Debtor's bankruptcy petition. This is a question of law, and the Court accordingly reviews the bankruptcy court's decision *de novo*. *In re Mathiason*, 16 F.3d 234 (8th Cir.1994). This issue is a question of first impression in this District and the Eighth Circuit.

■ Unless the Code specifically creates an exception, secured claims are given priority and satisfied before any payments for unsecured claims. Section 507(a)(4) creates a fourth-level priority status for certain unsecured pre-petition claims. Specifically, § 507(a)(4) provides that:

> The following expenses and claims have priority in the following order.... (4) Fourth, allowed unsecured claims for contributions to an employee benefit plan—
>
> (A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first....

11 U.S.C. § 507(a)(4). The question on this appeal, then, is whether unpaid workers' compensation premiums are "contributions to an employee benefit plan." In resolving this question, the Court initially recognizes that a presumption exists favoring an equal distribution of a bankrupt debtor's limited resources; as a result, statutory priorities within the Code should be narrowly construed. *See Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir.1986) (holding that priorities under § 507(a)(4) must be narrowly construed) (citing, *inter alia*, *Joint Indus. Bd. of Elec. Indus. v. United States*, 391 U.S. 224, 228, 88 S.Ct. 1491, 1493–94, 20 L.Ed.2d 546 (1968)); *In re Lull Corp.*, 162 B.R. 234, 239 (Bankr. D.Minn.1993) (same). With this canon of construction in mind, the Court will determine the scope of § 507(a)(4) by looking at its plain language, legislative history, and purpose.

As the bankruptcy court properly recognized, the starting point for resolving this issue is the language of the Code itself. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). The plain meaning of the Code is conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafter." *Id.* at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Although the Code provides definitions for over 50 different terms, it does not specifically define the phrase "employee benefit plan." Because the Code does not provide a definition, Appellant urges the Court to look to the construction of "employee benefit plan" as the phrase is used in the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. ch. 18 (1985 & Supp. 1994). Unlike the Code, ERISA does define the term "employee benefit plan."[2] This

---

2. 29 U.S.C. § 1002(3) provides that an "employee benefit plan" means an "employee welfare benefit plan...." 29 U.S.C. § 1002(1) then provides:

(1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereaf-

ter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or

definition does not specifically refer to workers' compensation insurance policies. Nonetheless, a workers' compensation insurance policy may fit within the scope of the ERISA definition. Courts have developed guidelines for determining whether an "employee benefit plan" exists for ERISA purposes when the proffered plan is not literally within the terms of the ERISA definition. *See Donovan v. Dillingham,* 688 F.2d 1367 (11th Cir. 1982).

■ A workers' compensation insurance policy may or may not fit within these court-developed guidelines. Contrary to Appellant's assertions, however, whether workers' compensation insurance fits within a court's construction of "employee welfare plan" is irrelevant. The ERISA definition and associated court guidelines were designed to effectuate the purposes of ERISA, not the Bankruptcy Code. Congress specifically limited its ERISA § 1002 definitions, stating that they were "for the purposes of this [§ 1002] subchapter." 29 U.S.C. § 1002. Wausau has not cited any conclusive legislative history or related material to show Congress intended the ERISA definition to be incorporated into the Bankruptcy Code. Indeed, the fact that Congress specifically defined over 50 terms in the Code shows that if Congress intended anything other than the ordinary meaning of the phrase "employee benefit plan," it knew how to do so with unmistakable clarity. In spite of this, Wau-

sau asks the Court to interchange a definition from an unrelated statute promulgated four years earlier. It is not the Court's role to read the ERISA definition into § 507(a)(4) of the Bankruptcy Code. That is a task for Congress.[3]

■ Although Congress did not define the phrase "employee benefit plan," Congress did provide specific guidance on how to interpret that phrase. Congress explained with unusual particularity why § 507(a)(4) was promulgated, stating:

> Paragraph (4) [of § 507(a)] overrules *United States [v.] Embassy Restaurant,* 359 U.S. 29 [79 S.Ct. 554, 3 L.Ed.2d 601] (1958) [ (1959) ] [and *Joint Industries [Industry] Board v. United States,* 391 U.S. 224 [88 S.Ct. 1491, 20 L.Ed.2d 546] (1968) ], which held that fringe benefits were not entitled to wage priority status. The Bill recognizes the realities of labor contract negotiations, under which wage demands are often reduced if adequate fringe benefits are substituted. The priority granted is limited to claims for contributions to employee benefit plans such as pension plans, health or life insurance, and others arising from services performed after the earlier of one year....

H.R.Rep. No. 595, 95th Cong., 2d Sess. 357 (1977) *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6313; S.Rep. No. 989, 95th Cong.2d Sess. 69 (1978) *reprinted in*

---

hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

Notably, 29 U.S.C. § 1003(b)(3) excludes from the statute's coverage any plan if "such plan is *maintained solely for the purposes of complying* with applicable workmen's compensation or disability insurance plans."

**3.** The havoc that would result if the definitions of terms in different federal programs were interchanged and intermingled by the judiciary as the Appellant's theory requests is staggering. As a simple but poignant example, the Court found at least nine different definitions of the term "employer" *within the federal labor laws alone. See*

29 U.S.C.A. §§ 152(2) (labor management relations), 262(a) (Fair Labor Standards Act), 630(b) (age discrimination in employment), 652(5) (Occupation Safety and Health Act), 1002(5) (ERISA), 2001(2) (employee polygraph protection), 2101(a) (workers' retraining notification), 2611(4) (family medical leave); 29 C.F.R. § 102.1 (National Labor Relations Board regulations).

Moreover, the term "employee benefit plan" is not so well-established that it has become universally accepted as a term of art. *Compare Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 249–50, 96 L.Ed. 288 (1952) ("where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed").

1978 U.S.Code Cong. & Admin.News 5787, 5855. Against this backdrop, the issue before the Court becomes whether, under the plain meaning of its terms, employer workers' compensation insurance premium payments should be equated with bargained-for fringe benefits such as contributions to pension plans, health insurance, or life insurance. The plain meaning of these words shows they should not.

■ Payments for a workers' compensation policy are not bargained-for substitutes for wages. In Minnesota, they are mandated by statute. Minnesota Statutes section 176.181, subd. 2 requires that, unless specifically exempted, Minnesota employers must either 1) carry workers' compensation insurance or 2) demonstrate the ability, and receive written authorization, to be self-insured. Thus, in "the realities of contract negotiations," unlike medical, health and life insurance, payment of workers' compensation premiums is irrelevant to the bargaining process. Employers may not choose to forego purchasing workers' compensation insurance, and employees may not choose to accept a higher wage in lieu of the insurance. As a result, payments to a workers' compensation insurance carrier are not bargained-for wage substitutes.

Moreover, an employer does not buy workers' compensation insurance to "benefit" its employees under the ordinary meaning of the term. First, as noted, an employer purchases workers' compensation insurance because it is required to do so by statute. Second, and more fundamentally, workers' compensation insurance simply serves as a method for an employer to allocate risks. It allows an employer to make a finite, predictable outlay rather than risking unpredictable and potentially crippling workers' compensation payments to injured employees. The employee's right to payment is exactly the same, regardless of whether it comes directly from the employer or indirectly from the carrier. This right to payment is fixed by statute and totally unaffected by the insured or uninsured status of an employer.[4] Minn. Stat. § 176.021, subd. 1 (1992) (holding employers subject to workers's compensation laws liable to any employee for work related injury). This is a marked contrast to medical, health, or life insurance. These latter types of insurance confer upon employees a right to payment they would otherwise be without. As such, they are manifestly fringe benefits.[5] These rights to payment are rights the employee would have to purchase but for the employer's contribution, whereas with workers' compensation insurance, it is the employer, not the employee, who is insured. To the extent there is a benefit at all, it belongs to the employer.

Both § 507(a)(4)'s plain language and its legislative history, as reflected in the House and Senate Reports, demonstrate that contributions to an "employee benefit plan" are not the same as employer's workers' compensation premium payments. This construction of the phrase "employee benefit plan" is also consistent with the purposes of the Code. Section 507(a)(4) was adopted specifically to place non-monetary compensation owed by a debtor to its employees on the same level as wage compensation. As discussed, workers' compensation insurance payments are not a wage substitute. More generally, the Code was promulgated to ensure the fair and uniform treatment of creditors. To that end, preferential treatment is given to unsecured creditors only in exceptional circumstances. Wausau has provided no compelling reason to show why funds should be taken from HLM Corporation's other unsecured creditors and given to it.

---

4. The mere fact that an employee may or may not find it easier or more expedient to collect from a workers' compensation insurance carrier than an employer does not alter this analysis. The fact that an employer buys workers' compensation insurance no more converts the insurance into an employee benefit plan than, for example, compulsory motor vehicle liability insurance converts auto insurance into a "pedestrian benefit plan" or compulsory medical malpractice insurance converts malpractice insurance into a "patient benefit plan."

5. This is yet another difference between health or life insurance and workers' compensation insurance. If the employer does not make health care insurance contributions, the employees will not receive health benefits. However, Minnesota has created a special fund from which employees receive their workers' compensation payments in the event their employer is illegally uninsured. Minn.Stat. § 176.183, subd. 1. In this case, the employees also are given additional legal rights against the employer. *Id.*, subd. 3.

The Court has examined § 507(a)(4)'s language, history, and purpose. Typically, in addition to these sources, courts rely on other judicial interpretations of a statute. Neither the District of Minnesota nor the Eighth Circuit has addressed the issue before the Court. Furthermore, the decisions from other jurisdictions relating to § 507(a)(4) are not helpful; in fact, they are irreconcilable. (*See In re Arrow Carrier Corp.*, 154 B.R. 642 (Bankr.D.N.J.1993) (holding that unpaid, pre-petition workers' compensation premiums are not "employee benefit plan" contributions under § 507(a)(4)); *Employers Ins. of Wausau v. Plaid Pantries, Inc.*, 10 F.3d 605 (9th Cir.1993) (holding that unpaid, pre-petition workers' compensation premiums are "employee benefit plan" contributions under § 507(a)(4)); *In re Jet Florida Sys., Inc.*, 80 B.R. 544 (S.D.Fla.1987) (holding that ERISA definition of "employee benefit plan" was not incorporated into § 507(a)(4)); *In re AOV Indus., Inc.*, 85 B.R. 183 (Bankr.D.D.C.1988) (holding that ERISA definition of "employee benefit plan" was incorporated into § 507(a)(4)).

### Conclusion

Based upon the files, records and proceedings, and for the reasons herein provided, **IT IS ORDERED** that the Memorandum Order Sustaining the Trustee's Objection to Claim No. 20 is **AFFIRMED.**

United States Bankruptcy Court,
W.D. Missouri.