## In re The MONTALDO CORPORATION, d/b/a Montaldo's, Debtor.

### Bankruptcy No. 95–10416C–11G.

United States Bankruptcy Court, M.D. North Carolina, Greensboro Division.

Jan. 3, 1997.

**15.**

| Defendants Owe | | Debtor Owes | |
|---|---|---|---|
| | $12,900.70 | | $20,091.36 |
| + | 6,000.00 | + | 600.00 |
| + | 6,669.15 | | |
| | $25,569.85 | | $20,691.36 |

Kenyann G. Brown, Raleigh, NC, for Aetna.

## MEMORANDUM OPINION

WILLIAM L. STOCKS, Chief Judge.

This case came before the court on October 22, 1996, for hearing upon the Debtor's objection to claim no. 312 of Aetna Life Insurance Company ("Aetna") in the amount of $86,022.73. Margaret R. Costley appeared on behalf of the Debtor and Kenyann G. Brown appeared on behalf of Aetna. The Debtor's objection raises the issue of whether Aetna's claim for unpaid insurance premiums is entitled to priority under § 507(a)(4) of the Bankruptcy Code.

### FACTS

The following facts are not in dispute. Prior to January 1, 1995, Aetna had in force group health and life insurance coverages for employees of the Debtor under policies which the Debtor had procured from Aetna. Effective January 1, 1995, the Debtor terminated the Aetna policies and initiated a self-funded health insurance plan for its employees. At the time that the Aetna policies were terminated by the Debtor, the monthly premiums for November and December of 1994 were unpaid. These premiums remained unpaid when this case was filed on February 21, 1995. Aetna's claim includes $65,149.27 for these unpaid premiums for November and December of 1994. The Aetna claim also includes the sum of $20,873.46, representing monthly payments of $6,957.82 for the months of December of 1994 and January and February of 1995 which came due under a "bankruptcy payback agreement" which Debtor entered into as a part of Debtor's first Chapter 11 case. These payments are for insurance coverage provided by Aetna for periods more than 180 days before this case was filed. These amounts account for the total Aetna claim in the amount of $86,022.73.

### ANALYSIS

Section 507(a)(4) grants priority to allowed unsecured claims for contributions to an employee benefit plan arising from services rendered within 180 days before the

Margaret R. Costley, Greensboro, NC, for Debtor.

date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first.[1] The 180 day requirement of § 507(a)(4) eliminates $20,873.46 of the Aetna claim from priority since it is undisputed that this portion of the claim is related to insurance coverage provided more than 180 days before this case was filed. This leaves $65,149.27 of premiums related to coverage which was provided within 180 days, which Aetna claims is entitled to priority under § 507(a)(4).

The cases have split on the issue of whether premiums owed by the debtor/employer to an insurer providing insurance coverage on employees of the debtor/employer constitute "contributions to an employee benefit plan within the meaning of § 507(a)(4)." The cases concluding that such premiums do have priority under § 507(a)(4) include *Employers Insurance of Wausau v. Plaid Pantries, Inc.,* 10 F.3d 605 (9th Cir.1993); *In re Saco Local Development Corp.,* 711 F.2d 441 (1st Cir. 1983); *In re Allegheny International, Inc.,* 138 B.R. 171 (Bankr.W.D.Pa.1992); and *In re Lummus Industries, Inc.,* 193 B.R. 615 (Bankr.M.D.Ga.1996). Cases reaching a contrary result and holding that insurance premiums do not fall within § 507(a)(4) include *In re HLM Corp.,* 62 F.3d 224 (8th Cir.1995), and *In re AER–Aerotron, Inc.,* 182 B.R. 725 (Bankr.E.D.N.C.1995).

The starting point in determining whether the premiums owed to Aetna are entitled to priority in this case is the language of § 507(a)(4) itself, which should be interpreted according to its plain meaning. *In re HLM Corp.,* 183 B.R. 852, 854 (D.Minn. 1994), *aff'd,* 62 F.3d 224 (8th Cir.1995). However, in interpreting and applying § 507(a)(4), this court must be cognizant of the rule of construction which is applicable in interpreting and applying a statutory provision providing for priority treatment. There is a presumption "favoring an equal distribution of a bankrupt debtor's limited resources. . . ." *In re HLM Corp.,* 183 B.R.

852, 854 (D.Minn.1994), aff'd, 62 F.3d 224 (8th Cir.1995). Consequently, the canon of construction to be followed in construing a statutory priority is that a priority should be narrowly construed. *See In re Suburban Motor Freight, Inc.,* 36 F.3d 484, 487 (6th Cir.1994) ("priority claims must be carefully limited since every such claim reduces the fund available to general creditors"); *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 100 (2nd Cir.1986); *In re Unimet Corp.,* 100 B.R. 881, 883 (Bankr.N.D.Ohio 1988) ("priority statutes are to be given strict construction"); *In re Columbia Packing Co.,* 47 B.R. 126, 130 (Bankr. D.Mass.1985) ("priorities derogate from the basic purpose of a maximum pro rata distribution to unsecured creditors . . . [a]ccordingly, priorities should be construed strictly"). This is the rule to be followed in the Fourth Circuit. *Ford Motor Credit Co. v. Dobbins,* 35 F.3d 860, 865 (4th Cir.1994) ("The presumption in bankruptcy cases is that the debtor's limited resources will be equally divided among the creditors. Thus, statutory priorities must be narrowly construed.").

Based on the language of the statute, the court concludes that the premiums owed to Aetna in this case are not entitled to priority under § 507(a)(4). Section 507(a)(4) grants priority to "contributions" to an employee benefit plan. Aetna's claim is for premiums arising from the issuance of a policy of insurance. "Premiums" are not "contributions," nor is a policy of insurance issued by an insurer an "employee benefit plan." Certainly, in ordinary usage, the words "premium" and "contribution" are not synonymous, nor are premiums generally referred to as "contributions." Furthermore, premiums owed to a commercial insurer do not arise from "services rendered" as required under § 507(a)(4). The rendering of services by employees results in obligations to the employees and not to an insurer.

---

1. Section 507(a)(4) contains a further limitation which limits claims for an employee benefit plan "to the extent of (i) the number of employees covered by each such plan multiplied by $4,000.00, less (ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan." No contention is made that this provision is applicable to the Aetna claim.

Because the terms used in § 507(a)(4) are not defined in the Bankruptcy Code, some of the cases granting priority status to insurance premiums have done so by adopting broad definitions from other statutes. The court declines to take this approach in the present case. Such an approach is contrary to the rule that priorities should be given a narrow, strict interpretation. Secondly, although the Bankruptcy Code does not define "contributions" or "employee benefit plan", it does not follow that definitions for these terms should be incorporated from other federal legislation such as the Employee Retirement Income Security Act of 1974 (ERISA), even though these terms may be defined in such legislation. As pointed out in *In re HLM Corp.,* 183 B.R. 852, 855 (D.Minn.1994), aff'd, 62 F.3d 224 (8th Cir.1995), definitions contained in ERISA were designed to effectuate the purposes of ERISA, not the Bankruptcy Code, and there is nothing in the legislative history indicating that Congress intended for the ERISA definition of "employee benefit plan" to be incorporated into the Bankruptcy Code. "It is not the Court's role to read the ERISA definition into § 507(a)(4) of the Bankruptcy Code. That is a task for Congress." *Id.* at 855. *Accord In re Jet Florida Systems, Inc.,* 80 B.R. 544, 547 (Bankr.S.D.Fla.1987).

■ The legislative history regarding the adoption of § 507(a)(4) supports the conclusion that the premiums owed to Aetna are not entitled to priority under § 507(a)(4). The legislative history regarding the adoption of § 507(a)(4) confirms that the sole intent and purpose of § 507(a)(4) was to benefit the employees of a bankrupt employer/debtor. It does not reveal any Congressional intent to grant a priority to insurance companies or the insurance industry. *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 357 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6313; S.Rep. No. 989, 95th Cong.2d Sess. 69 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787, 5855. Congress sought to benefit employees of a bankrupt employer by elevating to priority status promised employee "fringe benefits" which had not been received by employees prior to the filing of a bankruptcy case. In doing so, Congress expressly overruled two Supreme Court cases, *United States v.*

*Embassy Restaurant,* 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1958), and *Joint Industry Board v. United States,* 391 U.S. 224, 88 S.Ct. 1491, 20 L.Ed.2d 546 (1968). Neither of these cases involved a claim by an insurance company for premiums owed by an employer. *United States v. Embassy Restaurant, supra,* involved contributions owed by an employer to a welfare fund which was organized to provide benefits for the employees. These benefits included current as well as prospective benefits to be provided to the employees in the future. The "contributions" in question were due under collective bargaining agreements which had been obtained by the labor union who represented the employees. The statutory priority in effect at that time was one for "wages ... due to workmen." The Supreme Court ruled that the contributions in question were not "wages" and were not "due to workmen" since they were payable to the trustees of the welfare fund. Similarly, *Joint Industry Board v. United States, supra,* involved contributions owed by the debtor/employer to an employees' annuity plan established by a collective bargaining contract. Benefits were payable from the annuity plan to employees upon their death, retirement or ceasing to be a participant under the plan. The contributions from employers, of course, funded these benefits which likewise were ongoing and prospective in the sense of being paid to employees in the future upon their death or retirement. The Supreme Court again denied priority status to the contributions under the statutory priority in effect at the time.

Both of these cases involved "plans" which had been created for the sole purpose of providing continuing payments or benefits to the employees. The "contributions" to these plans were necessary in order for such "plans" to be able to provide the continuing benefits to the employees. It is easy to see how employees therefore were benefited by giving priority status to such "contributions." However, the fact that Congress sought to overrule two cases which had denied priority status to such "contributions" and such continuing benefits to employees does not necessarily evidence an intent to grant priority

status to insurance premiums owed by an employer to an insurer for past insurance coverage on employees, since to do so benefits only the insurance company and not the employees.

In the present case, the premiums sought by Aetna are for health and life coverage provided by Aetna during November and December of 1994. Claims by employees which arose during November and December, while such coverage was in effect, are payable to the employees without regard to whether the premiums ultimately are paid. In short, coverage and protection for the employees became vested while the coverage remained in effect and the employees will receive no more or no less regardless of whether the premiums are ever paid. *See generally Pitts v. American Security Life Ins. Co.,* 931 F.2d 351 (5th Cir.1991); *Fields v. Blue Shield of California,* 163 Cal.App.3d 570, 209 Cal.Rptr. 781 (Cal.Ct.App.1985); *Wright v. Prudential Ins. Co.,* 27 Cal.App.2d 195, 80 P.2d 752 (Cal.Ct.App.1938); *Trucken v. Metropolitan Life Ins. Co.,* 303 Mass. 501, 22 N.E.2d 120 (1939); C.T. Dreschler, Annotation, *Time of Disability or Death with Regard to Termination of Coverage Under Group Policy,* 68 A.L.R.2d 150, § 6, at 160 (1959); C.T. Drechsler, Annotation, *Cancellation or Modification of Master Policy as Termination of Coverage Under Group Policy,* 68 A.L.R.2d 249, 266–69 (1959). Hence, in the present case, the benefits intended for the employees are not dependent upon whether the premiums are paid as a priority claim.

The situation in the present case differs from the situation which arises where an employer has in effect a self-funded insurance plan for employees which is under funded when the bankruptcy case is filed, leaving employee medical bills owed by employees or other claims *by employees* unpaid. Unlike a commercial insurer engaged in the business of writing insurance coverages for a profit to the public at large, employee health and welfare funds, employee pension funds and employer-funded health insurance plans are cre-

ated solely for the benefit of the covered employees. Such funds and plans are funded by direct contributions from the employer. Such funds and plans, in reality, are merely conduits for passing the promised contributions from the employer to the employees. These types of plans constitute an "employee benefit plan" within the meaning of § 507(a)(4) and the amounts which the employer has agreed to pay to the employees or to the trustees or administrators of the plan, constitute "contributions" arising from services rendered by the employees within the meaning of § 507(a)(4). Treating these payments as "contributions" within the meaning of § 507(a)(4) benefits the employees of the bankrupt and thus is entirely consistent with the intent and purpose behind the § 507(a)(4) priority.[2] *See In re Edgar B, Inc.,* 200 B.R. 119 (M.D.N.C.1996). *See also In re Jet Florida Systems, Inc.,* 80 B.R. 544 (S.D.Fla.1987) (involving a "self-insurance program" under which employees paid their medical bills and were to be reimbursed by the employer for covered expenses). Unlike these cases, the claim now before the court does not involve the Debtor's self-funded plan nor claims by employees for unpaid medical bills.

There is no evidence in the present case of employees having benefited in the sense of Aetna having continued to provide coverage longer than it otherwise would have but for the existence of an assumed priority under § 507(a)(4). Nothing in the record suggests that when Aetna continued to provide the coverage in November and December, it had any notion that the Debtor intended to file a bankruptcy case or that the premiums for November and December would not be paid by the Debtor. It would be sheer conjecture to surmise that Aetna continued to provide coverage during November and December in reliance on having a priority claim in a bankruptcy case. In fact, the more logical conclusion is that had Aetna known prior to November that the premiums for November and December would not be paid before Debtor filed for bankruptcy relief it would

---

**2.** Such a situation arose in the present case with respect to the self-funded health benefit plan instituted by the Debtor effective January 1, 1995, and the amounts required to fund the

payment of unpaid employee medical claims were recognized as having priority under § 507(a)(4).

have canceled the coverage immediately without regard to whether its premiums would have priority in the bankruptcy case to be filed by the Debtor.

Furthermore, there is no basis for supposing that Congress adopted § 507(a)(4) as a means of protecting or promoting the solvency of the insurance industry or out of concern that without the § 507(a)(4) priority the industry would be unable to provide the benefits required under policies of insurance covering employees. In fact, neither of the Supreme Court cases which prompted the enactment of § 507(a)(4) involved insurance policies or insurance companies.

In actuality, Aetna is in the same boat as all the other unsecured, non-priority creditors who also provided goods and/or services in the belief that the Debtor would continue in business and pay for the goods and services in the ordinary course of business. Neither the rationale behind § 507(a)(4) nor its statutory language requires that Aetna be elevated above the other unsecured creditors in this case. *In re AER–Aerotron,* 182 B.R. 725, 728 (Bankr.E.D.N.C.1995).

Many of the cases which give priority to insurance premiums under § 507(a)(4) do so in reliance upon *In re Saco Local Development Corp.,* 711 F.2d 441 (1st Cir.1983). In giving priority to insurance premiums in that case the court stated that "to allow the insurer to obtain its premiums through the priority would seem the surest way to provide the employees with the policy benefits to which they are entitled." *Id.* at 449. It is unclear from the facts of that case why the payment of benefits to employees was contingent upon the premiums being paid to the insurer. However, as pointed out above, in the present case, claims which arose during November and December, while the policy was in effect, are payable to employees without regard to whether the premiums are paid. Hence, in the present case, unlike the situation apparently involved in *Saco,* payment of the premiums as a priority claim is not necessary to provide the benefits to which the employees are entitled from Aetna. In *Saco* the court also stated that "employees cannot be harmed by the insurance company's right to assert the Sec. 507(a)(4), for the priority is expressly subordinated to the Sec. 507(a)(3) wage priority." *Id.* at 449. This may be true, assuming that the employees do not have general unsecured claims over and above their $4,000.00 priority under § 507(a)(3). However, to allow the insurance company to have the benefit of the § 507(a)(4) priority as the court did in *Saco* seems inconsistent with § 507(d) which provides that "[a]n entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection ... (a)(4) ... of this section is not subrogated to the right of the holder of claim to priority under such subsection." To permit an insurance company to have priority under § 507(a)(4), a priority which was enacted for the benefit of employees, is tantamount to subrogating the insurance company to the priority of the employees under § 507(a)(4) which is impermissible under § 507(d). Finally, the court in *Saco* and the cases following *Saco* did not follow the rule of construction which this court is required to follow, i.e., the rule that priorities must be given a narrow or strict construction. As the Fourth Circuit Court of Appeals has stated, "statutory priorities must be narrowly construed." *Ford Motor Co. v. Dobbins,* 35 F.3d at 865. In *Saco* the court gave the priority the broadest, most expansive interpretation possible.

## CONCLUSION

For the reasons stated in this memorandum opinion, an order will be entered contemporaneously herewith sustaining the Debtor's objection to Aetna's claim and allowing the Aetna claim as a general, unsecured claim in the amount of $86,022.73.