**In re BRANIFF, INC., Debtor.**

**Bankruptcy No. 89–3325–BKC–6C1.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

March 23, 1998.

Howard T. Glassman, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Debtor.

Peter H. Levitt, Yoakley, Valdes–Fauli & Stewart, P.A., Miami, FL, for John Hancock Mutual Life Insurance Company.

## DECISION DETERMINING LEGAL ISSUES AS PER PARTIES' STIPULATION ON CLAIM NO. 14573 FILED BY JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY

C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

This contested matter is before the court on remand from the district court.

### Procedural Background

The debtor, Braniff, Inc., filed its objection (Document No. 2954) to Claim No. 14573 filed by the John Hancock Mutual Life Insurance Company. The John Hancock claim is a priority claim under Section 507(a)(4) for contributions to an employee benefit plan. After this court sustained the debtor's objection and held that the John Hancock claim was merely a general unsecured claim entitled to no priority (Documents Nos. 5255, 5256, and 5528), the district court on appeal held otherwise (Document No. 8233).

On remand, the parties agreed that resolution of stipulated legal issues would facilitate an ultimate determination of the dispute. Accordingly, the parties filed a stipulation setting forth those issues (Document No. 8310), and they have filed their briefs (Documents Nos. 8318, 8319, 8331, and 8332). The court is therefore in a position to determine the stipulated legal issues.

### Factual Background

The John Hancock claim arises under a group health and life insurance policy, as amended. This policy was for the benefit of employees of Braniff and certain affiliates. The policyholder was the trustee of Braniff's welfare benefit trust, and Braniff was obligated to fund the trust. (For these purposes, the parties have not differentiated between Braniff and the trust; they have treated them as a single entity.) This policy was in effect during the 180–day period prior to Braniff's bankruptcy filing.

Under this arrangement, Braniff was responsible for paying employee health care claims in a total amount up to a set monthly limit, and John Hancock was responsible for paying amounts over that limit. As to the self-insured portion that Braniff was to pay, Braniff was to fund the trust. John Hancock, which also served as plan administrator, would then draw funds from the trust to pay the claims. In the event Braniff failed to fund the trust sufficiently, John Hancock would pay the claims from its own funds and seek reimbursement from Braniff. The John Hancock claim involves some $1,311,764.68 of employee health claims that John Hancock paid for Braniff's employees subject to its right of reimbursement from Braniff.

### Statutory Priority

Section 507 of the Bankruptcy Code, as applicable to this dispute,[1] provides in relevant part:

(a) The following expenses and claims have priority in the following order:

\*     \*     \*     \*     \*     \*

(4) Fourth, allowed unsecured claims for contributions to an employee benefit plan—

(A) arising from services rendered within 180 days before the date of the filing of the petition ...; but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by each such plan multiplied by $2,000; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

The parties have agreed that the John Hancock claim is governed by the pre-amendment $2,000 amount.

---

1. The Bankruptcy Reform Act of 1994, Pub.L. 103–394 (effective on October 22, 1994), increased the dollar amount of the fourth priority in paragraph (4)(B)(i) from $2,000 to $4,000.

*Stipulated Legal Issues*

The court decides the stipulated issues as framed by the parties as follows:

1. *With reference to 11 U.S.C. § 507(a)(4)(A), what are the "services" which must be rendered within the 180–day period?*

▇ In interpreting this provision of the statute, Braniff argues that the term "services" means work performed by Braniff employees. On the other hand, John Hancock argues that the term means the provision by John Hancock of health insurance coverage for Braniff employees under its arrangement with Braniff.

The clear weight of the authority supports John Hancock's view. *Official Committee of Unsecured Creditors (In re Maxwell Newspapers, Inc.)*, 192 B.R. 633, 636 (Bankr. S.D.N.Y.1996)["[C]ourts have taken for granted that the provision of insurance constitutes 'services' for the purposes of section 507(a)(4)."]; *In re Gerald T. Fenton, Inc.*, 178 B.R. 582, 589–90 (Bankr.D.D.C. 1995)["[C]laims for unpaid premiums do 'aris[e] from services rendered,' as required by § 507(a)(4)(A)."]. *Cf. Official Creditors' Committee v. Blue Cross & Blue Shield of Georgia, Inc. (In re Lummus Industries, Inc.)*, 193 B.R. 615, 617–19 (Bankr.M.D.Ga. 1996); *Allegheny International, Inc. v. Metropolitan Life Insurance Co.*, 145 B.R. 820, 822 (W.D.Pa.1992).

Although there is dated authority to the contrary, *In re Pittston Stevedoring Corp.*, 40 B.R. 424, 426 (Bankr.S.D.N.Y.1984),[2] the court is persuaded that the better view is in accord with the authorities that hold that the provision of insurance coverage is a "service" within the meaning of this provision of the statute.

2. *With reference to 11 U.S.C. § 507(a)(4)(A), when does a claim arise from "services"?*

▇ Braniff contends that the claim must arise during the 180–day period before the filing of the bankruptcy petition. John Hancock, on the other hand, contends that the statute imposes no requirement with regard to when the claim arises. Nevertheless, John Hancock argues, its claim arose during this 180–day period.

The parties cite to no authority that addresses the issue the parties have framed. Instead, the court is required to rely on a plain reading of the statute to discern its meaning in the context of this issue.

Under the health insurance arrangement between the parties that was in place, Braniff was required to fund the trust, John Hancock was required to advance monies to pay employees' claims if Braniff failed to fund the trust, and Braniff was required to reimburse to John Hancock any monies John Hancock advanced on behalf of Braniff. Section 507(a)(4)(A) requires that the "services," that is, the provision of insurance benefits under this arrangement, be rendered in the 180–day period. Under Section 101(5)(a), John Hancock's claim for reimbursement arises when Braniff became obligated under the contract documents to reimburse the monies it advanced to Braniff employees on Braniff's behalf.

Under Section 507(a)(4)(A), it makes no difference when the claim arose as long as the "services" to which the claim is related were provided within the 180–day period. The court can find nothing in the statute that imposes an additional requirement that the claim itself also arise during the 180–day period, and the court can find nothing in the authorities that the parties have cited that imposes this additional requirement.

3. *Did the Debtor fail to preserve issue # 1 prior to or on appeal from the Court's Final Order Regarding John Hancock Claims Litigation Based on the Court's Decision Entered on July 29, 1994 (Document # 5256)?*

Braniff asserts that it originally raised the issue described in Stipulated Issue 1 but the

---

**2.** Braniff also cites *Principal Mutual Life Insurance Co. v. Joint Committee of Unsecured Creditors (In re CirrusCorp )*, 196 B.R. 76, 77–78 (S.D.Tex.1996), for the proposition that "services" must relate to work performed by employees. Whatever the holding of *CirrusCorp*, the court does not read the decision as supporting in any clear form the proposition that Braniff urges.

issue was never decided. Braniff therefore wants the court to decide it now. John Hancock argues, however, that the district court has foreclosed this issue by its holding that the claim is entitled to priority status.

First, the court notes that Braniff originally objected to the John Hancock claim on precisely the same basis it does now in Stipulated Issue 1. [*See, e.g.,* Braniff's 6/2/94 memorandum in support of its objection at 10–12, Document No. 5152]. Thus, the issue has always been part of Braniff's objection.

Second, neither this court nor the district court on appeal have decided this issue. The reason for this is clear: this court's original decision dealt only with the issue of whether the John Hancock claim was one for reimbursement or one for subrogation. Similarly, the district court's order on appeal dealt solely with determining whether the John Hancock claim was a claim for subrogation, as this court had held, or a claim for reimbursement, as John Hancock contended. The district court's order specifically recites, "The Court finds that, under *Jet Florida,* the payments made by John Hancock should be considered contributions to an employee benefit plan." [3/31/97 order at 10, Document No. 8233]. The district court then concludes:

> Accordingly, the Court finds that John Hancock's claim is properly a claim for reimbursement instead of subrogation and should be considered contributions to an employee benefit plan entitled to priority under § 507(a)(4).

### CONCLUSION

Based on the foregoing, the decision of the Bankruptcy Court is **REVERSED** and **REMANDED** for proceedings consistent with this Order.

[*Id.* at 10–11].

Nothing in the district court's order suggests it has determined the "services" issue. As the court reads the district court's order, the district court simply held that John Hancock's claim is a claim for reimbursement as to which Section 507(a)(4) applies rather than a subrogation claim not entitled to priority as

this court originally held.[3] On remand, John Hancock is nevertheless still required to establish all of the requirements imposed by Section 507(a)(4) if some or all of its claim is to be accorded priority status. Stated another way, the only task remaining for this court on remand is to make a calculation of the amount of the priority claim. That amount is to be calculated by (1) determining the amount of the claim arising from services rendered within the 180–day period [Section 507(a)(4)(A)] and (2) applying to these amounts the computations and limitations described in Section 507(a)(4)(B).

As to the first component of this task, Braniff is completely free to argue, as it has, that "services" are limited to work performed by employees. Unfortunately for Braniff, however, the court has disagreed with Braniff's view on this point and has concluded that "services" includes the provision of insurance coverage by John Hancock under the arrangement that was then in place. Thus, the court must determine the amount of money John Hancock advanced to Braniff employees on Braniff's behalf within the 180–day period.

In summary, the issue is preserved, and Braniff can raise it here. Braniff has raised the issue, but John Hancock has prevailed on the merits.

4. *With reference to 11 U.S.C. § 507(a)(4)(B)(i), how is the "number of employees covered by each such plan" to be determined?*

■ Braniff contends that the number of employees should be the *average* number of permanent Braniff employees, working over 20 hours per week, i.e., those covered by the John Hancock policy, employed during the 180–day period. John Hancock says that the number should be the *total* number of employees covered by the policy during the 180–day period.

A "plain meaning" reading of the statute makes apparent that John Hancock's interpretation is the correct one. Section 507(a)(4)(B)(i) itself does not provide a time frame for determining the number of em-

---

**3.** A claim for reimbursement that is subrogated to the employees' rights pursuant to Section

509(a) would not receive priority treatment pursuant to Section 507(d).

ployees covered by each such plan. This subsection, however, is a continuation of the sentence that begins in subsection (a)(4) and continues through subsection (a)(4)(A). Reading the sentence as a whole, therefore, it is clear that the number of employees must be all the employees who had coverage during the 180–day period.

Braniff's argument relies on *In re Columbia Packing Co.*, 47 B.R. 126, 131–32 (Bankr. D.Mass.1985), a case vastly different from this one in its facts that used an averaging approach. In *Columbia Packing*, the primary factor determining the amount of the pension fund contribution in issue was the average number of covered employees. This case is different from *Columbia Packing*, however, because the average number of employees covered by the John Hancock policy has no relation to the medical expenses paid by John Hancock and is not a factor at all in determining the amount of the John Hancock claim. *Columbia Packing*'s averaging methodology, therefore, has no application here.

■ Braniff's argument is also based on its desire to construe priorities narrowly for the benefit of fairness to the unsecured creditors. Although no one can argue with the principle that priorities are to be construed narrowly, that principle does not empower the court to distort plain statutory language to reach what it considers to be a desirable result.

5. *With reference to 11 U.S.C. § 507(a)(4)(B)(ii), what payments are included in determining the "aggregate amount paid to such employees under paragraph (3) of this subsection [11 U.S.C. § 507(a)(3)]"? Are, for example, "necessity" payments included (i.e., pre-petition wages and other employee compensation paid by the Debtor after the commencement of the case to insure the retention of employees)? Or, are the payments limited to those that are made, pursuant to a confirmed plan, to holders of allowed section 507(a)(3) claims?*

■ Braniff urges that "necessity" payments should be included. John Hancock urges that they should not be included.

In the early days of this case, the court entered orders permitting the post-petition payment of certain pre-petition wage and wage-related claims. As is often the case in operating Chapter 11 cases, the court did this for two reasons. First, it was necessary that Braniff pay its employees for work performed pre-petition if the employees were to remain on the job post-petition. The filing of a bankruptcy case presents many uncertainties for employees. If their pay is interrupted, employees are obviously not going to remain on the job despite the fact that their continuation in place is vitally important for the debtor.

Second, in any event, the pre-petition wages are subject to the priority of Section 507(a)(3). Thus, in all but the direst of circumstances, the debtor will ultimately pay the pre-petition wages because of their very high priority. Accordingly, the court authorizes their payment early in the case rather than requiring that the employees wait for payment at the end of the case.

Viewed this way, "necessity" payments are indeed and in fact paid to employees under Section 507(a)(3). Accordingly, the court should include these necessity payments in determining "the aggregate amount paid to such employees under paragraph (3) of this subsection." This is consistent with what other courts faced with this issue have done. *The LTV Corp. v. Pension Benefit Guaranty Corp. (In re Chateaugay Corp.)*, 115 B.R. 760, 785 (Bankr.S.D.N.Y.1990), *vacated by request of the parties*, 1993 WL 388809 (S.D.N.Y.1993); ["Consequently, the PBGC's claims allegedly entitled to § 507(a)(4) status must be reduced by the amount of the claims already paid to the employees directly."]; *In re Structurlite Plastics Corp.*, 86 B.R. 922, 933 (Bankr.S.D.Ohio 1988)[pre-petition accrued payroll, vacation pay, and sick-leave pay paid to salaried and hourly employees post-petition under a "necessity" payment order are to be included in the § 507(a)(4) calculation]; *In re P.C. White Truck Line, Inc.*, 22 B.R. 540, 541 (Bankr.M.D.Ala. 1982)[wage claims already paid outside of plan context are included].

6. *With reference to 11 U.S.C. § 507(a)(4)(B)(ii), which employees are referred to by the phrase "such employees"? Does the term "such employees" refer to the employees covered by the Hancock plan? Or, does the term "such employees" refer to all employees covered by any employee benefit plan that was in effect pre-petition?*

■ John Hancock contends that the term refers only to the employees covered by the John Hancock policy. In its briefs, Braniff does not directly state a position on the correct resolution of this stipulated issue.

A plain reading of the statute supports John Hancock's view. The relevant statutory language is:

(B) for *each such plan,* to the extent of—

(i) the number of employees covered by *each such plan* multiplied by $2,000; less

(ii) the aggregate amount paid to *such employees* under paragraph (3) of this subsection....

11 U.S.C. § 507(a)(4)(B)(emphasis added). The term "such employees" clearly refers to the employees covered by "each such plan." In this case, that is the John Hancock plan and not other plans. "The language is clear under [Section 507(a)(4)(B)] that the computation must be made as to each plan [separately]." *In re P.C. White Truck Line, Inc.,* 22 B.R. at 541.

7. *With reference to 11 U.S.C. § 507(a)(4)(B)(ii), what payments are included in determining the "aggregate amount paid by the estate on behalf of such employees to any other benefit plan"? Are pre-petition payments to any benefit plan included? Are payments that are administrative expenses of the estate included? Or, are only post-petition payments to other holders of allowed section 507(a)(4) priority claims included?*

■ John Hancock argues that only payments to benefit plans within the purview of Section 507(a)(4) are to be included. Braniff contends that the other benefit plans need not themselves qualify for Section 507(a)(4) priority status to qualify for the payment reduction contemplated by Section 507(a)(4)(B)(ii).

None of the authorities cited by the parties deal with this issue or shed any light on its resolution. A plain reading of the statute, however, establishes a two-prong test: payments qualify for the reduction calculation contemplated by Section 507(a)(4)(B)(ii) if (1) the payment is made by Braniff on behalf of an employee subject to the John Hancock policy and (2) the payment is made "to any other benefit plan."

Nothing that the court can read in the statute requires that the other benefit plan itself be a plan that qualifies for priority status under Section 507(a)(4). Thus, pre-petition payments to *any* benefit plan are included if Braniff makes them on behalf of an employee subject to the John Hancock policy. Similarly, payments that are administrative expenses of the estate are included if they otherwise meet the requirements of the two-prong test.

8. *With reference to 11 U.S.C. § 507(a)(4)(B)(ii), what kinds of benefit plans are considered in determining the aggregate amount of payments? All ERISA defined plans? Only ERISA qualified plans? Any benefit plans established voluntarily by the employer? Federal or state-mandated employee benefits, such as worker's compensation insurance payments?*

■ John Hancock argues that the phrase "employee benefit plan" covers only those types of plans that constitute a form of compensation typically bargained for in the employer-employee setting, whether as part of a collective bargaining arrangement or otherwise. John Hancock acknowledges that this definition is broader than the definition of employment benefit plan found in the Employee Retirement Income Security Act of 1974 ("ERISA"), but John Hancock asserts it does not include involuntary, governmentally imposed programs, such as workers compensation insurance. Braniff, on the other hand, urges a still broader definition that would include government mandated programs, such as workers compensation insurance.

As stated by a commentator, "The vast majority of employee benefit programs will qualify for priority regardless of the definition used." 4 L. King, *Collier on Bankruptcy* ¶ 507.06[1] at 507–36 (15th ed. rev. 1997). The issue is not controlled by the definition contained in ERISA, *Official Labor Creditors Committee v. Jet Florida Systems, Inc. (In re Jet Florida Systems, Inc.)*, 80 B.R. 544, 547 (S.D.Fla.1987), and a clearly established plan underwritten and operated by a recognized third-party insurer is not required, *In re Saco Local Development Corp.*, 711 F.2d 441, 448–49 (1st Cir.1983).

It appears to the court that the real dispute between the parties on this point is whether government mandated employee benefits, such as workers compensation insurance, are to be included in the definition of "employee benefit plan." On this, there is a split of authority. Cases that include such programs as employee benefit plans for purposes of Section 507(a)(4) are *Employers Insurance of Wausau v. Plaid Pantries, Inc.*, 10 F.3d 605, 607 (9th Cir.1993), and *In re Gerald T. Fenton, Inc.*, 178 B.R. at 585–89. The recent cases excluding statutorily mandated insurance programs, such as workers compensation, are *Employers Insurance of Wausau v. Ramette (In re HLM Corp.)*, 62 F.3d 224, 226–27 (8th Cir.1995), and *Manufacturers Alliance Insurance Co. v. Satriale (In re Allentown Moving & Storage, Inc.)*, 214 B.R. 761, 763–67 (E.D.Pa.1997).

In studying these conflicting authorities, the court has difficulty accepting the reasoning of the authorities to the effect that government mandated programs are not benefits to employees because they are not bargained for in lieu of compensation. Clearly, they are benefits to the employees for which the employer must pay. In addition, although they may not be bargained for, that is only because the government has made them mandatory before any bargaining begins. The government's mandate, however, neither detracts from the benefit these programs bring to employees nor undermines their characterization as compensation. "Compensation" is defined as "something that constitutes an equivalent or recompense" and "payment to an unemployed or injured worker or his dependents." Webster's Ninth New Collegiate Dictionary at 268 (Merriam-Webster Inc.1988). "We see no merit in the trustee's related argument that the employees must have 'substituted' the fringe benefits for wages." *In re Saco Local Development Corp.*, 711 F.2d at 449.

The court concludes, therefore, that the authorities allowing statutorily mandated insurance programs to be included in the definition of employee benefit plan, especially *In re Gerald T. Fenton, Inc.*, express the better view. Accordingly, the court adopts that position.

9. *Is the monetary limit contained in 11 U.S.C. § 507(a)(4)(B)(i) intended to be a per employee or aggregate recovery ceiling?*

■ Braniff contends that the $2,000 monetary limit contained in Section 507(a)(4)(B)(i) is a per employee limit. John Hancock argues that it is an aggregate limit.

A plain reading of the statute reveals no per employee limitation. To the contrary, the statute specifically contemplates a pure multiplication of the number $2,000 times the number of employees. The statute states quite clearly: "the number of employees covered by each such plan multiplied by $2,000." Thus, the statute could not state in clearer terms an aggregate limit rather than a $2,000 per employee limit.

The reported cases have read the statute in precisely this way: *In re Edgar B, Inc.*, 200 B.R. 119, 122–24 (M.D.N.C.1996); *In re Columbia Packing Co.*, 47 B.R. at 131; *In re P.C. White Truck Line, Inc.*, 22 B.R. at 541. Although three cases cited by Braniff appear to have applied a per employee limit, *In re B & F Construction, Inc.*, 165 B.R. 745, 746 (Bankr.D.R.I.1994), *In re National Bickford Foremost, Inc.*, 116 B.R. 351, 352 (Bankr. D.R.I.1990), *In re Unimet Corp.*, 100 B.R. 881, 884 (Bankr.N.D.Ohio 1988), these courts did not discuss the issue at all. To the extent these cases may have applied a per employee limit, they are clearly wrong.

*Conclusion and Directions*

The court has now determined each of the issues the parties framed for the court. The parties are therefore directed to confer and attempt to resolve the remaining issues that may exist. If the parties are able to agree on the remaining issues, the parties may submit an appropriate motion and agreed form of order after the required notice period. If the parties are unable to agree on the remaining issues, the court will convene another preliminary pretrial and scheduling conference. If the parties desire the court to schedule such a conference, the parties should so inform the court through the clerk.