**In re A.B.C. FABRICS OF TAMPA, INC., d/b/a Mae's Home & Fabric Center, Debtor.**

**No. 99–9852–8G1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 8, 2001.

Harley E. Riedel, II, Wanda H. Anthony, Stichter, Riedel, Blain & Prosser, P.A., Tampa, Florida, for debtor.

S. Ranchor Harris, III, Winston–Salem, North Carolina, for claimants, Amy and Greg Rayburn.

**ORDER ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON AMENDED OBJECTION TO THE PRIORITY CLAIM OF AMY AND GREG RAYBURN**

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came before the Court for hearing to consider the Motion for Sum-

mary Judgment on Amended Objection to the Priority Claim of Amy and Greg Rayburn filed by the Debtor, A.B.C. Fabrics of Tampa, Inc.

Amy and Greg Rayburn (the Rayburns) filed a claim in this case in the amount of $37,241.93 for "monies owed for medical expenses under employee health plan." The Rayburns assert that the claim is an unsecured priority claim pursuant to § 507(a)(4) of the Bankruptcy Code.

The Debtors object to the priority status of the claim. Generally, the Debtor contends that Greg Rayburn was never an employee of the Debtor, that the medical claims were incurred more than 180 days prior to the filing of the bankruptcy petition, and that the Debtor never agreed to provide health care coverage to the Rayburns. For these reasons, the Debtor asserts that the claim is not entitled to priority status pursuant to § 507(a)(4), and that the claim should be allowed only as a general unsecured claim. The Debtor contends that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law.

## Background

Greg Rayburn was the chief executive officer of a corporation known as Silas Creek Retail, Inc. (Affidavit of Greg Rayburn, ¶ 2; Affidavit of Gary Cohen, ¶ 2).

On or about October 15, 1997, the Debtor, Carolina Sales, Inc., purchased substantially all of the assets of Silas Creek Retail, Inc. pursuant to an Asset Purchase Agreement.

Paragraph 2.05 of the Asset Purchase Agreement is entitled "Excluded Obligations," and provides that Carolina Sales, Inc. shall not assume certain obligations. The excluded obligations include:

(f) except as otherwise specifically provided in paragraphs (f) and (g) of the Assumption Agreement, any liability or obligation whatsoever in connection with or related to current or former officers, directors, employees, agents, independent contractors or leased employees of either Silas Party or any of its Affiliates or their respective predecessors, including (i) any liability or obligation whatsoever (including Taxes) arising under, or otherwise in connection with or related to, any Employee Benefit Plan (including any Multiemployer Plan within the meaning of Section 3(37) of ERISA to which either Silas Party or any of its Affiliates or predecessors is or was a party or sponsor, or has or had any direct or indirect obligation to contribute) and any plan, policy, trust, understanding, arrangement or agreement of any kind described in clause (i) or (ii) of the first sentence of Section 6.15(b), including the Silas L.P. 401(k) Plan, (ii) *any liability or obligation under COBRA or the WARN Act as a result of the consummation of the transactions contemplated by this Agreement* (including the termination by the Silas Parties of employment of any of their employees), and (iii) *any liability or obligation whatsoever for* accrued wages, vacation time, sick leave, personal time, paid days off, *medical or health benefits,* disability benefits, or other similar benefits (it being understood that, *except as otherwise specifically provided in paragraph (g) of the Assumption Agreement, the items listed in this clause (iii) are the sole responsibility of the Silas Parties* ), and including with respect to all of the foregoing any contingent liability or obligation.

(Emphasis supplied). The Assumption Agreement provides that Carolina Sales, Inc. agrees to assume certain obligations, including:

(g) any *amounts which become due and payable on or after the Closing Date for medical/health claims of Employees arising or accruing prior to the Closing Date* under the self-insured medical/health benefit plans of the Silas Parties, *up to a maximum amount of $300,-000;*

(Emphasis supplied).

The sale of Silas Creek's assets to the Debtor closed on November 13, 1997, ef-

fective as of November 1, 1997. Greg Rayburn remained as chief executive officer during the transition associated with the sale. (Affidavit of Greg Rayburn, ¶¶ 3, 4).

Greg Rayburn states that during the month of November, 1997, while the transition was taking place, he received health care benefits through a plan offered by the Debtor, Carolina Sales, Inc. (Affidavit of Greg Rayburn, ¶¶ 5, 6) (Exhibit 8 to Creditor's Brief, "Plan Document, Self–Funded, The Health Care Plan of Carolina Sales, Inc."). Greg Rayburn states that he "was being treated as an employee of ABC Fabrics for the purpose of these benefits." (Affidavit of Greg Rayburn, ¶ 9).

Greg Rayburn's employment terminated on November 30, 1997. (Affidavit of Greg Rayburn, ¶¶ 7, 10).

Upon the termination of his employment, Greg Rayburn states that he was offered COBRA benefits to maintain health care benefits for himself and his family following the termination. (Affidavit of Greg Rayburn, ¶¶ 7, 10). Although the documentation does not appear in the record, it appears that Greg Rayburn accepted the offer of COBRA benefits, and paid the required premiums to obtain the coverage. (Affidavit of Greg Rayburn, ¶ 11) ("Since my termination, I have continued to pay the necessary premiums for maintaining the health insurance for myself and my family.")

Greg Rayburn and his family received medical services from health providers, and submitted claims for payment of such services pursuant to the healthcare plan. The medical services were provided during the period commencing on September 11, 1997, and ending on November 9, 1998. (Attachment to Proof of Claim, "Dates of Treatment"). The total cost of the medical services was $37,241.93. (Proof of Claim No. 209 in A.B.C. Fabrics; Proof of Claim No. 1 in Retail Network, Inc.; and Proof of Claim No. 8 in Carolina Sales, Inc.). The claims have not been paid.

The Debtors state that Rayburn was the CEO of Silas Creek Retail, Inc., through November 30, 1997, that he resigned his position, and that he never was an employee, officer, or director of any of the Debtors. The Debtors assert that any benefits provided for Rayburn were not provided under the Health Care Plan of Carolina Sales, Inc., but were those contracted for under the Asset Purchase Agreement and the Assumption Agreement.

The Health Care Plan of Carolina Sales, Inc. provides that it is a "Self–Funded" plan, and that "[n]o health insurance issuer is responsible for the financing or administration of this Plan." (Health Care Plan of Carolina Sales, Inc., p.S4). It also provides that "[t]he benefit fund may or may not be governed by a trust and may be included as part of the Employer's general assets" (Health Care Plan of Carolina Sales, Inc., p. 5), and states that it is "not trusteed." (Health Care Plan of Carolina Sales, Inc., p.S5).

The plan provides for a Plan Supervisor, which is "ACS Consulting Services, or its successor as may be appointed by the Employer," (Health Care Plan of Carolina Sales, Inc., p.S5), a Plan Administrator, which is "the Employer," (*Id.*), and a Plan Coordinator which is "the person named by the Employer at the Corporate office." (*Id.*).

The Debtors filed their petitions under Chapter 11 of the Bankruptcy Code on June 15, 1999. The Debtors were operating their businesses as of the date of the bankruptcy petitions. (Affidavit of Gary Cohen, ¶ 3).

### Discussion

The Rayburns assert that their claim is entitled to priority status pursuant to § 507(a)(4) of the Bankruptcy Code. The Debtor contends that "Mr. Rayburn's claim for unpaid medical bills is not a § 507(a)(4) priority claim since Mr. Rayburn was never an employee of the Debtor and his medical expenses were incurred outside the time limitation of

§ 507(a)(4)(A)." (Debtor's Brief in Support of Debtor's Motion for Summary Judgment, p. 3).

■ Section 507(a)(4) of the Bankruptcy Code provides as follows:

**11 U.S.C. § 507. Priorities**

(a) The following expenses and claims have priority in the following order:

.    .    .    .    .

(4) Fourth, allowed unsecured claims for contributions to an employee benefit plan—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by each such plan multiplied by $4,300; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

"Section 507(a)(4) was enacted in response to Supreme Court cases decided under the Bankruptcy Act that held that fringe benefits, unlike wages, were not entitled to priority status. The legislative history indicates that Congress believed the fringe benefits were often taken by employees in lieu of higher wages and that Congress thought it appropriate to supplement the priority for wages with a priority for contributions to an employee benefit plan." 4 Collier on Bankruptcy, ¶ 507.06 (15th ed.). The sole purpose of § 507(a)(4) was "to benefit the employees of a bankrupt employer/debtor." "Congress sought to benefit employees of a bankrupt employer by elevating to priority status promised employee 'fringe benefits' which had not been received by employees prior to the filing of a bankruptcy case." *In re The Montaldo Corporation,* 207 B.R. 112, 115 (Bankr. M.D.N.C.1997).

**A. Whether the Rayburns were covered by the Plan.**

■ In this case, one question for determination is whether the Rayburns were covered by the Debtor's Health Care Plan. The Court finds that a factual dispute exists with respect to this issue.

The Debtor contends that it never agreed to provide coverage to the Rayburns, and that any obligations related to the coverage were expressly excluded from the obligations assumed by the Debtor in connection with the Asset Purchase Agreement. (Debtor's Motion for Summary Judgment, ¶ 12; Debtor's Brief in Support of Motion for Summary Judgment, pp. 10–12). According to the Debtor, the exclusion from liability is evidenced by § 2.05 of the Asset Purchase Agreement, in combination with an Assumption Agreement and a separate Settlement Agreement and Release entered pursuant to the Asset Purchase Agreement. (Debtor's Motion for Summary Judgment, Exhibits A, B, and C).

In contrast, the Rayburns contend that they in fact received coverage under the Debtor's Health Care Plan in November of 1997, that they elected to choose continuation coverage pursuant to the COBRA provisions of the Plan upon Greg Rayburn's termination, and that they paid premium for such continuation coverage according to the terms of the agreement. (Affidavit of Greg Rayburn, ¶ 5 through ¶ 11). The Rayburns assert that their coverage was never denied, either in November of 1997 or after they began paying the premiums as COBRA insureds. (Affidavit of Greg Rayburn, ¶ 13).

Based on the record, the Court finds that a factual dispute exists regarding whether the Rayburns were covered by the Debtor's Health Care Plan. Further proceedings are required to resolve this factual issue.

### B. Whether Greg Rayburn was an "employee" entitled to priority status.

■ Even if the evidence establishes that the Rayburns were covered by the Debtor's Plan, the Debtor asserts that Greg Rayburn was not an "employee" of the Debtor for purposes of § 507(a)(4) of the Bankruptcy Code. The Debtor contends that the policy underlying § 507(a)(4) focuses on the claimant's position as an employee of the Debtor, since an employee has contributed to the Debtor's assets through his services, and therefore deserves the special protection provided by the statute. (Debtor's Brief, pp. 5–6).

On its face, of course, § 507(a)(4) refers only to an "employee benefit plan," and does not specifically require that a claimant be an "employee" to be entitled to priority status.

A copy of the Health Care Plan of Carolina Sales, Inc. is attached to the Rayburn's Brief as Exhibit 8. The provisions for "New Employee Eligibility" appear on page 15 of the Plan.

### ELIGIBILITY PROVISIONS

#### NEW EMPLOYEE ELIGIBILITY

Persons eligible for coverage under this plan shall include only these persons who meet all of the following conditions:

1. Employed by the Employer on a permanent full-time basis for at least the *Qualifying Hours* per week as set forth in the Schedule of benefits.

2. Actively-at-work at the assigned place of employment and in performance of the assigned duties.

3. Member of an *Eligibility Class* as set forth in the Schedule of Benefits.

4. Fulfill the *Eligibility Waiting Period* in the Schedule of Benefits.

(Creditor's Brief, Exhibit 8, Health Care Plan, p. 15) (Emphasis in original). The provision regarding Continuation Benefits appears on page 44 of the Plan:

### ELECTION OF CONTINUATION BENEFITS

Upon the occurrence of the event giving rise to extended coverage:

1. Termination or reduction of hours of Plan participant.

. . . . .

The participant will be notified by the Plan Administrator of the appropriate options of coverage and the cost thereof. From such date of notification the participant will have sixty (60) days to make such election.

(Creditor's Brief, Exhibit 8, Health Care Plan, p. 44). An Appendix follows the main text of the Plan:

### COBRA APPENDIX

On April 7, 1986, a federal law was enacted (Public law 99–272, Title X) *requiring that most employers sponsoring group health plans offer employees* and their families the opportunity for a temporary extension of health coverage (called "continuation coverage") at group rates in certain instances where coverage under the plan would otherwise end. This notice is intended to inform you, in summary fashion, of your rights and obligations under the continuation coverage provisions of the law . . . .

*If you are an employee of the Employer covered by this Plan,* you have the right to choose this continuation coverage if you lose your group health coverage because of a reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part).

. . . . .

When the Plan Administrator is notified that one of these events has happened, the Plan Administrator will in turn notify you that you have the right to choose continuation coverage. Under the law, you have at least 60 days from the date you would lose coverage because of one of the events described above, or the date notice of your election rights is sent

to you, whichever is later, to inform the Plan Administrator that you want continuation coverage.... If you choose continuation coverage, the Employer is required to give you coverage which, as of the time coverage is being provided, is *identical to the coverage provided under the plan to similarly situated employees* or family members.

(Creditor's Brief, Exhibit 8, Health Care Plan, COBRA Appendix, pp. i–ii) (Emphasis supplied).

The Court has considered the provisions of the Debtor's Health Care Plan and the COBRA Appendix set forth above. If the evidence establishes that coverage under the Plan was extended to Greg Rayburn in November of 1997, if Greg Rayburn thereafter was notified of his right to choose continuation coverage upon his termination, and if he in fact chose such coverage, in accordance with the Plan, then the Rayburns may assert that they are entitled to any benefits to which any other person would be entitled, including priority status pursuant to § 507(a)(4) of the Bankruptcy Code.

The Plan clearly limits eligibility for coverage to employees and their family members. The conditions for eligibility include employment on a permanent, full-time basis and the performance of assigned duties. (Health Care Plan, p. 15). Continuation coverage is available to "employee[s] of the Employer covered by" the Plan. (Health Care Plan, COBRA Appendix, p. i). If the Debtor has determined that Rayburn satisfied the eligibility requirements set forth in the Plan and qualified for the benefits of the plan, the Debtor cannot now assert that Rayburn is not an "employee" for purposes of § 507(a)(4).

As noted, § 507(a)(4) addresses "contributions to an employee benefit plan." Consequently, if the Debtor in this case determined in November of 1997 that the services provided by Greg Rayburn (to either the Debtor or the Debtor's predecessor) satisfied the conditions of the plan so that the Rayburns were entitled to the benefits of the plan, the contributions that may be due from the Debtor to the plan should have whatever status the Bankruptcy Code provides for such contributions.

## C. Whether the claim arises from "services rendered within 180 days."

■ Finally, even if the evidence establishes that the Rayburns were covered by the Debtor's Health Care Plan, the Debtor contends that the Rayburn's claims are not for contributions "arising from services rendered within 180 days before the date of the filing of the petition." According to the Debtor, the Rayburns' claim does not fall within the 180–day statutory limitation because Greg Rayburn was not an employee within the 180–day period, and because the medical bills at issue were not incurred within 180 days prior to the filing. (Debtor's Brief in Support of Motion for Summary Judgment, p. 10).

In response, the Rayburns contend that the statute does not include any requirement that the claim arise within 180 days before the filing of the bankruptcy. Instead, according to the Rayburns, the appropriate inquiry centers on the services that were rendered within the 180–day period. The Rayburns assert that the "services" contemplated by § 507(a)(4) consist of the provision of insurance benefits. Since the Debtor's Health Plan was in effect within the 180–day period, the Rayburns contend that the time limitation of § 507(a)(4) was satisfied. (Creditor's Brief, pp. 8–10).

The interpretation of the phrase "arising from services rendered within 180 days," as set forth in § 507(a)(4), is by far the most unique aspect of this case. The provision of priority status for contributions to employee health plans "arising from services rendered within 180 days" before the date of the filing of the petition has led to judicial interpretation in several settings. There appear to be several types of health benefit plans. Some benefit plans are pro-

vided entirely through insurance, some are provided through insurance with retrospectively rated premiums, some are funded through funds or trusts, some are paid through administrators, and some are paid by direct reimbursements to employees.

In cases where insurance carriers have paid health benefits pursuant to insurance policies, and in some instances have provided claims processing and payment services for which they charge, and the premiums due from the debtors are based on the payments and charges, some courts have concluded that the premiums that are due from debtors are obligations of the debtors for contributions to employee benefit plans. If these obligations have arisen within 180 days of the filing, the courts have concluded that they are debts for contributions to employee benefit plans arising from services rendered within 180 days before the date of the filing. In these cases, the courts view the debtors' obligation to pay the insurer as a claim for "contributions to an employee benefit plan," and the provision of the claims payment and processing services by the insurer as the "services rendered" that give rise to the obligation. In these cases, courts have not looked to the status of employment of the beneficiaries of the health plan, and have not looked to the date the underlying medical claims were incurred. Courts have looked to the terms of the debtors' obligations to the insurance carrier, and if obligations arose within the 180 day period, the claims have been allowed with priority status. See, for example:

1. *In re Braniff, Inc.*, 218 B.R. 628 (Bankr.M.D.Fla.1998). " . . . the provision of insurance coverage is a 'service' within the meaning of this provision of the statute." *Id.* at 631. "Under section 101(5)(a), John Hancock's claim for reimbursement arises when Braniff became obligated under the contract documents to reimburse the monies it advanced to Braniff employees on Braniff's behalf." *Id.* "Under Section 507(a)(4)(A), it makes no difference

when the claim arose as long as the 'services' to which the claim is related were provided within the 180 day period."

2. *In re Cirruscorp [CirrusCorp]*, 196 B.R. 76 (S.D.Tex.1996). Principal Mutual, the insurer, was entitled to priority for debts that "arose from claims paid" within the priority period. While it is not clear from the case, it appears that Principal mutual did not receive priority for the entire amount that became due within the 180 day period, because this amount appears to include retrospective premiums for claims paid prior to the priority period.

3. *In re Maxwell Newspapers, Inc.*, 192 B.R. 633 (Bankr.S.D.N.Y.1996). A preference action in which the Court stated that "the provision of insurance constitutes 'services' for the purposes of section 507(a)(4)"

4. *In re [Gerald T.] Fenton [Inc.]*, 178 B.R. 582 (Bankr.D.C.1995). Insurance companies provide services, and their claims for unpaid premiums arise from such services.

5. *In re Cardinal Industries, Inc.*, 164 B.R. 76, 78 (Bankr.S.D.Ohio 1993). Prudential's claim for fees for administering the self insured plan had the same priority status as advances from the administrator to pay claim under the plan.

6. Some courts do not agree with this interpretation, however. See *In re Montaldo Corporation*, 207 B.R. 112 (Bankr.M.D.N.C.1997) (Insurance company's premiums related to coverage provided within 180 days were not entitled to priority); *In re [AER] Aer–Aerotron, Inc.*, 182 B.R. 725 (Bankr.E.D.N.C. 1995) (Claims for unpaid insurance premiums do not arise from a service within the meaning of the statute).

While all courts may not agree that premiums to insurance companies are contributions to employee benefit plans, it is appropriate to conclude that the payment obligations of employers to self-funded

plans are contributions to employee benefit plans.

> [E]mployee health and welfare funds, employee pension funds and employer-funded health insurance plans are created solely for the benefit of the covered employees. Such funds and plans are funded by direct contributions from the employer. Such funds and plans, in reality, are merely conduits for passing the promised contributions from the employer to the employees.... Treating these payments as "contributions" within the of § 507(a)(4) benefits the employees of the bankruptcy and thus is entirely consistent with the intent and purpose behind the § 507(a)(4) priority.

*In re The Montaldo Corporation,* 207 B.R. 112, 116 (Bankr.M.D.N.C.1997). Self-funded plans are not insured, but may be funded by contributions from the employer to a trust or a fund that is administered by an administrator. In such cases, payment obligations to the plans for benefit payments and administrative services are similar to premiums due to an insurer for claims payments and administrative services. If the fund or administrator has paid benefits and provided administrative services within 180 days prior to the filing, the obligation of the employer to the fund or administrator should be a debt for a contribution to a plan for services rendered within the 180 day period.

The analysis requires some scrutiny where, as here, there is no separate fund from which benefits were paid. Since the plan administrator has not paid benefits, the plan administrator is not making a claim against the debtor. Rather, the claim is being made directly by the beneficiaries of the plan. The District Court for the Southern District of Florida concluded that the beneficiaries should be able to make such claim. "... [I]t is unlikely that Congress would have intended to allow as a priority an insurance company's claim for unpaid premiums, yet would deny priority status to individual employees who were owed insurance reimbursements." *In re*

*Jet Florida Systems, Inc.,* 80 B.R. 544, 548 (S.D.Fla.1987). The Court stated:

> [A]lthough Air Florida's self-insurance program may have been loosely administered and benefits irregularly paid, it was nevertheless an employee benefit plan for purposes of § 507(a)(4). This Court cannot conclude that a plan does not qualify under § 507(a)(4) simply because it is inefficiently managed. The self-insurance plan was, in fact, a continuation of and a substitute for the John Hancock plan that Air Florida could no longer afford. If Air Florida's reorganization petitions had been filed while its insurance plan was still underwritten by John Hancock, there is no doubt that the insurance company would be entitled to claim the unpaid premiums as a priority.... The dictates of logic and consistency with the broad view of employee benefit plans compel this Court to extend the same privilege to the individual employees who have outstanding claims for reimbursement for covered medical expenses.

*In re Jet Florida Systems, Inc.,* 80 B.R. 544, 548 (S.D.Fla.1987).

Accordingly, it appears appropriate to look to the point in time when the Debtor's obligations to make payments required under the health plan arose. If the Rayburns were covered by the Debtor's plan, any obligations with respect to the Rayburns claims that arose within 180 days before the date of the filing of the petition should have priority status. Further evidence is necessary to make this determination.

## Conclusion

The Rayburns filed a priority claim for medical expenses owed under the Debtor's employee Health Care Plan, and the Debtor objected to the priority status of the claim. A factual issue exists regarding whether the Rayburns were covered by the Debtor's Health Care Plan, since the Debtor contends that it never agreed to assume any obligations related to such coverage, and the Rayburns contend that

they in fact received such coverage and paid the premiums for continuation coverage. Further proceedings are necessary to resolve this factual issue.

If the Rayburns were covered by the Debtor's Health Care Plan, the Court finds that they are entitled to assert priority status pursuant to § 507(a)(4) of the Bankruptcy Code. If the Debtor previously had determined that Greg Rayburn satisfied the eligibility requirements set forth in the Plan and is entitled to the benefits of the plan, the Debtor may not now assert that the Rayburns are not entitled to whatever payment status the Bankruptcy Code provides for those benefits.

Finally, if the Rayburns were covered by the Debtor's Plan, the Court must determine whether obligations for the Debtors' contributions to the plan with respect to Rayburn's claim arose within 180 days before the date of the filing of the Debtors' petition in bankruptcy. Further proceedings are necessary to make this determination.

Accordingly:

**IT IS ORDERED** that:

1. The Motion for Summary Judgment on Amended Objection to the Priority Claim of Amy and Greg Rayburn filed by the Debtor, A.B.C. Fabrics of Tampa, Inc., is denied.

2. A pretrial hearing will be conducted in Courtroom 8A, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Tampa, Florida, on March 12, 2001, at 2:30 o'clock p.m. before the Honorable Paul M. Glenn to determine further proceedings with respect to this objection to claim.